[No. F048277. Fifth Dist. Dec. 6, 2006.]

ENRIQUE SANCHEZ et al., Plaintiffs and Appellants, v.
CITY OF MODESTO et al., Defendants and Respondents.

## COUNSEL

Heller Ehrman, George H. Brown, Warrington S. Parker, III, Peter E. Gratzinger, Nicholas S. Campins, Stephen A. Tuggy, Ronald A. Valenzuela; Lawyers' Committee for Civil Rights, Robert Rubin, Nicholas Espiritu; and Joaquin G. Avila for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Louis R. Mauro, Assistant Attorney General, Christopher E. Krueger and Douglas J. Woods, Deputy Attorneys General, for State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kathay Feng for California Common Cause and FairVote as Amici Curiae on behalf of Plaintiffs and Appellants.

Alan Smith, City Attorney; Hogan and Hartson, John W. Borkowski, Joseph G. Krauss, Nichelle Billips, Chhaya Malik and Monica Sahaf for City of Watsonville as Amici Curiae on behalf of Plaintiffs and Appellants.

Howrey, John E. McDermott; Richard Rudnansky, Interim City Attorney, and Roland R. Stevens, Assistant City Attorney, for Defendants and Respondents.

Gilbert Trujillo, City Attorney (Santa Maria), as Amicus Curiae on behalf of Defendants and Respondents.

Patrick Whitnell for League of California Cities as Amicus Curiae on behalf of Defendants and Respondents.

---

**OPINION**

**WISEMAN, J.**—The trial court granted the defense's motion for judgment on the pleadings after ruling that the California Voting Rights Act of 2001 (CVRA; Elec. Code § 14025 et seq.) was facially invalid under the equal protection clauses of the state and federal Constitutions. It entered judgment against plaintiff Latino voters, who allege that, because of racially polarized voting in the City of Modesto, they are precluded from electing any candidates in the city's at-large city council elections. No evidence has been presented in support of or in opposition to this claim. Rather, at a preliminary stage of the litigation, the trial court struck down the CVRA, ruling that any possible application would necessarily involve unconstitutional racial discrimination. As we will explain, Modesto's arguments do not support disposing of the Legislature's act in this summary manner.

Courts make two kinds of decisions about the constitutionality of laws: decisions about whether a law is invalid on its face and in all of its conceivable applications (called "facial" invalidity), and about whether a particular application of a law is invalid (called "as-applied" invalidity). In this case, the City of Modesto attempted to show that the CVRA is unconstitutional because it is facially invalid. Modesto's arguments cannot establish facial invalidity. The city may, however, use similar arguments to attempt to show *as-applied* invalidity later if liability is proven and a specific application or remedy is considered that warrants the attempt. For example, if the court entertains a remedy that uses race, such as a district-based election system in which race is a factor in establishing district boundaries, defendants may again assert the meaty constitutional issues they have raised here. In doing so, at that time they can ask the court to decide whether the particular application or remedy is discriminatory.

■ Why do Modesto's arguments fail to show that the CVRA is facially unconstitutional? Modesto takes the position that the CVRA is unconstitutional because it uses "race" to identify the polarized voting that causes vote dilution and prevents groups from electing candidates. Modesto claims that this use of race constitutes reverse racial discrimination and is a form of unconstitutional affirmative action benefiting only certain racial groups. However, this is not an accurate characterization of what the CVRA requires. The CVRA is race neutral. It does not favor any race over others or allocate burdens or benefits to any groups on the basis of race. It simply gives a cause of action to members of *any* racial or ethnic group that can establish that its members' votes are diluted through the combination of racially polarized voting and an at-large election system—like the election system used in Modesto. In this respect, it is similar to other long-standing statutes that create causes of action for racial discrimination, such as the federal Civil Rights Act or California's Fair Employment and Housing Act.

The reality in California is that no racial group forms a majority.[1] As a result, *any* racial group can experience the kind of vote dilution the CVRA was designed to combat, including Whites. Just as non-Whites in majority-White cities may have a cause of action under the CVRA, so may Whites in majority-non-White cities. Both demographic situations exist in California, even within our own San Joaquin Valley, and the CVRA applies to each in exactly the same way.

The trial court also found facially unconstitutional the portion of the CVRA that allows attorney fees to be awarded to prevailing plaintiffs. The trial court reached this issue even though it was moot—plaintiffs never had an opportunity to seek attorney fees, since they lost—and the city only briefed the issue after the trial court asked it to do so. Further, in reaching its decision, the court focused on an improbable set of hypothetical facts. The asserted invalidity of a single hypothetical application is not a proper basis for finding the fee clause invalid on its face.

The judgment is reversed and the case is remanded to the trial court.

### FACTUAL AND PROCEDURAL HISTORIES

Plaintiffs are Latino voters who reside in Modesto. They filed a complaint in Superior Court on June 3, 2004, alleging that, because of racially polarized voting, the city's at-large method of electing city council members diluted

---

[1] We take judicial notice of this fact, which was revealed by the 2000 census. (See <http://factfinder.census.gov/servlet/QTTable?_bm=y&-qr_name=DEC_2000_SF1_U_DP1&-geo_id=04000US06&-ds_name=DEC_2000_SF1_U&-_lang=en&-_sse=on> (as of Dec. 6, 2006) [census table reporting non-Hispanic Whites as 46.7 percent of state population].)

their votes. The complaint named as defendants the City of Modesto, the city clerk, the mayor, and each member of the city council.

According to the complaint, in Modesto's at-large election system, candidates for city council run for individual seats to which numbers are arbitrarily assigned and for each of which all the city's voters may vote. To win, a candidate must receive a majority of the votes cast for the seat for which he or she has chosen to run. A runoff between the top two vote-getters for a seat occurs if no candidate receives a majority. The complaint alleges that this system, combined with a pattern of racially polarized voting, regularly prevented Latino voters from electing any candidates of their choice or influencing city government. Although Latinos were 25.6 percent of the city's population of 200,000, only one Latino had been elected to the city council since 1911.

■ The complaint alleged one cause of action, a violation of the CVRA (Elec. Code, §§ 14025–14032),[2] and prayed for the imposition of a district-based system as a remedy. The CVRA provides a private right of action to members of a protected class where, because of "dilution or the abridgement of the rights of voters," an at-large election system "impairs the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election . . . ." (§ 14027; see § 14032.) To prove a violation, plaintiffs must show racially polarized voting. They do not need to show that members of a protected class live in a geographically compact area or demonstrate an intent to discriminate on the part of voters or officials. (§ 14028.)

Some background on federal voting rights law is helpful to provide context for the CVRA. Like the CVRA, section 2 of the Federal Voting Rights Act (FVRA) (42 U.S.C. § 1973) creates liability for vote dilution. A violation of the FVRA is established if "the political processes leading to nomination or election in [a] State or political subdivision [of a state] are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." (42 U.S.C. § 1973(b).) Amendments to the FVRA passed by Congress in 1982 made it clear that intentional discrimination by officials is not required to show a violation. (*Shaw v. Reno* (1993) 509 U.S. 630, 641 [125 L.Ed.2d 511, 113 S.Ct. 2816] (*Shaw*); *Thornburg v. Gingles* (1986) 478 U.S. 30, 35 [92 L.Ed.2d 25, 106 S.Ct. 2752] (*Gingles*).) Later, after noting that it has "long recognized" that at-large elections and multi-member districts can " ' "minimize or cancel out the voting strength" ' " of minorities (*Gingles, supra,* at p. 47), the Supreme Court delineated the elements of a vote-dilution

---

[2] Subsequent statutory references are to the Elections Code unless otherwise noted.

violation under the FVRA: "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." (*Gingles, supra*, 478 U.S. at pp. 50–51, fn. omitted.)

Section 2 of the FVRA does not allow states to use race however they want to in remedying vote dilution. In fact, the Supreme Court has recognized constitutional limitations on race-based districting plans adopted by state and local governments attempting to avoid section 2 liability. For example, in *Shaw, supra*, 509 U.S. 630, the court considered a new district map for the State of North Carolina, created by the state legislature after the results of the 1990 census gave the state a right to an additional member of the House of Representatives. The new districting plan included two majority-Black districts. The plaintiffs claimed the plan constituted an unconstitutional racial gerrymander. (*Id.* at pp. 633–634, 641.) Among the justifications the state offered for the plan was that the two majority-Black districts were needed to avoid liability for vote dilution under section 2 of the FVRA. (*Shaw, supra*, at p. 655.) Reversing the trial court's order dismissing the case, the Supreme Court held that the plaintiffs had stated a valid claim for relief under the equal protection clause of the Fourteenth Amendment. (*Shaw, supra*, at pp. 637–639, 642.) It stated that, because the majority-Black districts' shapes were so bizarre, they could not "rationally . . . be understood as anything other than an effort to separate voters into different districts on the basis of race," and the redistricting plan should be subjected by the trial court to strict scrutiny, just like "other state laws that classify citizens by race." (*Id.* at pp. 644, 649.)

Later cases explained that a finding that race was the "predominant" factor in creating a district—to which other factors were "subordinated"—is what triggers strict scrutiny. (*Bush v. Vera* (1996) 517 U.S. 952, 958–959 [135 L.Ed.2d 248, 116 S.Ct. 1941] (plur. opn. of O'Connor, J.) (*Vera*).) *Shaw* and its progeny therefore stand for the following proposition: While state and local governments are commanded not to permit racial vote dilution that violates section 2 of the FVRA, they are also forbidden to use race as the predominant factor in a redistricting scheme designed to avoid a violation unless that use of race passes strict scrutiny. The court has assumed without deciding that race-conscious measures undertaken to avoid section 2 liability pass strict scrutiny if those measures use race no more than is reasonably necessary to achieve section 2 compliance. (*Vera, supra*, 517 U.S. at pp. 976–979.)

The legislative history of the CVRA indicates that the California Legislature wanted to provide a broader cause of action for vote dilution than was provided for by federal law. Specifically, the Legislature wanted to eliminate the *Gingles* requirement that, to establish *liability* for dilution under section 2 of the FVRA, plaintiffs must show that a compact majority-minority district is possible. That said, the bill that ultimately became the CVRA did intend to allow geographical compactness to be a consideration at the *remedy* stage. A bill analysis prepared by staff for the Assembly Committee on Judiciary reflects this fact: "This bill would allow a showing of dilution or abridgement of minority voting rights by showing the first two *Thornburg* [*v. Gingles*, *supra*, 478 U.S. 30] requirements without an additional showing of geographical compactness. . . . This bill recognizes that geographical concentration is an appropriate question at the *remedy* stage. However, geographical compactness would not appear to be an important factor in assessing whether the voting rights of a minority group have been diluted or abridged by an at-large election system. Thus, this bill puts the voting rights horse (the discrimination issue) back where it sensibly belongs in front of the cart (what type of remedy is appropriate once racially polarized voting has been shown)." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976 (2001–2002 Reg. Sess.) as amended Apr. 9, 2002, p. 3 (italics added).)

Another point emphasized in the legislative history is California's lack of a racial majority group. The Assembly Judiciary Committee analysis says "[t]he author states that [the bill] 'addresses the problem of racial block voting, which is particularly harmful to a state like California due to its diversity. . . . In California, we face a unique situation where we are all minorities. We need statutes to ensure that our electoral system is fair and open. This measure gives us a tool to move us in that direction. . . .' " (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 976 (2001–2002 Reg. Sess.) as amended Apr. 9, 2002, p. 2.)

The bill ultimately became sections 14025 to 14032 of the Elections Code. Here is a synopsis of those provisions:

—Section 14027 sets forth the prohibited government conduct: "An at-large method of election may not be imposed or applied in a manner that impairs the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election, as a result of the dilution or the abridgement of the rights of voters who are members of a protected class, as defined pursuant to Section 14026."

—A protected class is a class of voters "who are members of a race, color or language minority group, as this class is referenced and defined in the federal Voting Rights Act (42 U.S.C. Sec. 1973 et seq.)." (§ 14026, subd. (d).)

—Section 14032 gives a right of action to voters in protected classes.

—Section 14028 lists facts relevant to proving a violation: The dilution or abridgement described in section 14027 is established by showing racially polarized voting. (§ 14028, subd. (a).) Circumstances to be considered in determining whether there is racially polarized voting are described. (§ 14028, subd. (b).) Lack of geographical concentration of protected class members and lack of discriminatory intent by the government are not factors in determining liability. (§ 14028, subds. (c), (d).) Certain other probative factors are included. (§ 14028, subd. (e).)

—The court shall "implement appropriate remedies, including the imposition of district-based elections," if it finds liability. (§ 14029.)

—Prevailing plaintiffs shall be awarded attorney fees. Prevailing defendants can recover only costs, and then only if the action was frivolous. (§ 14030.)

According to plaintiffs, the CVRA enlarges the potential for relief beyond that available under the FVRA in a number of ways, of which the elimination of the geographically compact majority-minority district requirement as an element of liability is only the beginning. First, freed of that requirement, a court could craft a remedy involving a crossover or coalition district. A crossover district is one in which, although members of the plaintiffs' group do not constitute a majority, that group can elect candidates of its choice by joining forces with dissident members of the racial majority who also live in the district. A coalition district is similar, except that members of the plaintiffs' group join forces with members of another racial minority group.

Second, a court could impose a remedy not involving districts at all, relying instead on one of several alternative at-large voting systems. In one of these, called cumulative voting, each voter has as many votes as there are open seats and may distribute them among several candidates or give them all to one candidate. In a cumulative voting system, a politically cohesive but geographically dispersed minority group can elect a single candidate by giving all its votes to that candidate, although it would be unable to elect any candidates in a conventional winner-take-all at-large system and could not form a majority in any feasible district in a district system.

Defendants in this case filed a motion for judgment on the pleadings, arguing that the CVRA was facially invalid under the equal protection clause of the Fourteenth Amendment and article I, section 7 (i.e., the equal protection provision) of the California Constitution. In response to a request by the trial court, defendants filed a supplemental brief arguing that the

CVRA's attorney fee provision also violated article XVI, section 6, of the California Constitution, which prohibits gifts of public funds. The trial court agreed with defendants on both points. It granted the motion and entered a judgment of dismissal.

## DISCUSSION

The standard of review for an order granting judgment on the pleadings is the same as that for an order sustaining a general demurrer: We treat as admitted all material facts properly pleaded, give the complaint's factual allegations a liberal construction, and determine de novo whether the complaint states a cause of action under any legal theory. (*DiPirro v. American Isuzu Motors, Inc.* (2004) 119 Cal.App.4th 966, 972 [14 Cal.Rptr.3d 787].) We may rely on any applicable legal theory in affirming or reversing because we " 'review the trial court's disposition of the matter, not its reasons for the disposition.' " (*Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1065 [20 Cal.Rptr.3d 562].)

■ Where reasonably possible, we are obliged to adopt an interpretation of a statute that renders it constitutional in preference to an interpretation that renders it unconstitutional. (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 60 [195 P.2d 1]; *Martin v. Santa Clara Unified School Dist.* (2002) 102 Cal.App.4th 241, 254 [125 Cal.Rptr.2d 337].) ■ Even judicial reformation of a statute is preferable to invalidation where reformation would better serve the intent of the Legislature. (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 660–661 [47 Cal.Rptr.2d 108, 905 P.2d 1248].) Principles of judicial self-restraint similarly require us to avoid deciding a case on constitutional grounds unless absolutely necessary; nonconstitutional grounds must be relied on if they are available. (*People v. Pantoja* (2004) 122 Cal.App.4th 1, 10 [18 Cal.Rptr.3d 492].)

### I. City's standing to challenge statute

As a threshold issue, plaintiffs contend that defendants are not entitled to bring their constitutional challenge to the CVRA. We disagree. Plaintiffs rely on a settled line of cases barring cities from mounting equal protection challenges to state statutes, but a second line of cases establishes an exception, into which this case falls. In light of our conclusion that defendants' equal protection challenge fails on its merits, we could decide this appeal without reaching the standing issue. We choose to address it, however, because the equal protection issue will likely arise on remand if the case reaches the remedy stage, and the standing question will surface again.

■ Defendants moved to strike the footnote in plaintiffs' reply brief in which standing was first raised and argued that we should not address it. We

disagree because standing can be raised at any time. (*Payne v. Anaheim Memorial Medical Center, Inc.* (2005) 130 Cal.App.4th 729, 745 [30 Cal.Rptr.3d 230]; *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1251 [15 Cal.Rptr.3d 344]; *People v. Leung* (1992) 5 Cal.App.4th 482, 490, fn. 2 [7 Cal.Rptr.2d 290].) The issue of standing here does not come up in the traditional context, as we shall explain; however, it is sufficiently similar to warrant application of the rule that it may be raised at any time.

Further, defendants have had two opportunities to brief the issue. They did so first in their motion to strike the footnote, where they requested leave to submit additional briefing, and included a supplemental brief as a section of their motion. This request is granted and the supplemental discussion in the motion is deemed filed. Defendants also submitted a supplemental brief on the issue in response to our briefing letter dated June 30, 2006. For these reasons, defendants cannot legitimately claim to be prejudiced by any lack of opportunity to inform the court of their position. We hold that addressing the issue is appropriate and deny the motion to strike.[3] We now turn to the merits.

■ Plaintiffs invoke the "well-established rule that subordinate political entities, as 'creatures' of the state, may not challenge state action as violating the entities' rights under the due process or equal protection clauses of the Fourteenth Amendment or under the contract clause of the federal Constitution." (*Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6 [227 Cal.Rptr. 391, 719 P.2d 987] (*Star-Kist*).) The concept of standing at issue here is not the usual one limiting the rights of plaintiffs, but a special one pertaining to cities and counties attempting, as plaintiffs or defendants, to challenge state laws: "The term 'standing' in this context refers not to traditional notions of a plaintiff's entitlement to seek judicial resolution of a dispute, but to a narrower, more specific inquiry focused upon the internal political organization of the state: whether counties and municipalities may invoke the federal Constitution to challenge a state law which they are otherwise duty-bound to enforce." (*Star-Kist, supra*, 42 Cal.3d at pp. 5–6, fn. omitted.)

The rule against city and county standing in cases of this kind derives from the United States Supreme Court's holdings in *Williams v. Mayor* (1933) 289 U.S. 36, 40 [77 L.Ed. 1015, 53 S.Ct. 431] (*Williams*) and a number of earlier cases. In *Williams*, the Maryland Legislature exempted a railroad from local taxes. (*Id.* at pp. 37–38.) The railroad was in the hands of a receiver

---

[3] In addition to the motion to strike and request for leave to submit supplemental briefing, a number of requests for judicial notice are pending. These requests, which we list in the Disposition, are granted.

appointed by a federal district court. Two cities filed claims in the receivership proceedings in the district court seeking taxes due. They challenged the tax-exemption statute under the equal protection clause of the Fourteenth Amendment. (*Williams, supra,* 289 U.S. at pp. 39–40.) The Supreme Court reversed a lower court decision invalidating the statute. Its explanation of this holding is simply: "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." (*Id.* at p. 40.) The court cited several of its own earlier cases, none of which explained the rule in any greater detail. (See, e.g., *Newark v. New Jersey* (1923) 262 U.S. 192, 196 [67 L.Ed. 943, 43 S.Ct. 539] [city not entitled to raise 14th Amend. equal protection challenge to state's imposition of water use fee]; *Trenton v. New Jersey* (1923) 262 U.S. 182, 185–188, 192 [67 L.Ed. 937, 43 S.Ct. 534] [city not entitled to challenge same fee under due process clause of 14th Amend. or under contract clause of art. I, § 10, of the U.S. Const.].)

California courts have applied the rule in a variety of contexts. (*Mallon v. City of Long Beach* (1955) 44 Cal.2d 199, 209 [282 P.2d 481] [city cannot rely on contract clause to obtain invalidation of state statute allegedly impairing preexisting contract between city and state]; *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority* (1999) 72 Cal.App.4th 366, 380 [85 Cal.Rptr.2d 28] [airport authority, as political subdivision of state, had no standing to challenge under due process clause of 14th Amend. state statute allowing city to review authority's development plans]; *Board of Supervisors v. McMahon* (1990) 219 Cal.App.3d 286, 296–297 [268 Cal.Rptr. 219] [county had no power to challenge under due process clause of 14th Amend. a state law requiring it to contribute county funds for welfare payments]; *City of Los Angeles v. City of Artesia* (1977) 73 Cal.App.3d 450, 457 [140 Cal.Rptr. 684] [City and County of Los Angeles could not seek invalidation under due process clause of 14th Amend. or contract clause of retroactive application of state law limiting amount counties could charge Lakewood Plan cities for police protection].) The Ninth Circuit in California has applied the rule as well. (*City of South Lake Tahoe v. California Tahoe* (9th Cir. 1980) 625 F.2d 231, 233–234 [city lacked standing to challenge under 14th Amend. a planning agency's land use rules promulgated pursuant to state statute].)

The California Supreme Court has held that the no-standing rule does not apply to a political subdivision's claim that a state statute encroaches on the power of Congress to regulate interstate commerce under the commerce clause of the United States Constitution. (*Star-Kist, supra,* 42 Cal.3d at pp. 4, 8–9.) It relied in part on federal cases holding that the no-standing rule also does not apply to challenges based on the supremacy clause of the United States Constitution. (42 Cal.3d at p. 8.) The court did not, however, disturb the

doctrine with respect to the equal protection and due process clauses of the Fourteenth Amendment and the contract clause, the areas in which it traditionally has been applied. (42 Cal.3d at pp. 5–6.)

A second line of cases establishes an exception to the no-standing rule for situations in which the claim of a city or county is best understood as a practical means of asserting the individual rights of its citizens. The first of these cases, *Drum v. Fresno County Dept. of Public Works* (1983) 144 Cal.App.3d 777 [192 Cal.Rptr. 782] (*Drum*), involved a county's due process challenge to its own inadequate notice to a building project's neighbors of a zoning-variance hearing. The county approved a request for a variance to enable a homeowner to build a garage. The notices of the variance hearing received by the neighbors described the garage. Later, the owner decided to add a second story with living quarters to the garage and requested a permit for the new design. The county issued the permit. When construction began, neighbors complained that they had not been informed about the second story. The county reversed its decision to issue the permit and issued a stop-work order. In the ensuing litigation between the owner and county, the county argued that the permit it issued for a two-story garage was invalid because it was not within the scope of the variance of which the neighbors had received notice; the neighbors' due process rights had therefore been violated. (*Id.* at pp. 779–781, 782.) We agreed with this position, rejecting the owner's argument that the county was not entitled to assert individual citizens' due process rights: "It would serve no legitimate interest to hold that appellant may not invoke lack of notice to its citizens in order to enjoin construction of respondents' building. Surely it should be able to invoke its own requirements of notice in order to preserve the public interest in preserving community patterns established by zoning laws." (*Drum, supra*, 144 Cal.App.3d at pp. 784–785.)

Admittedly, *Drum* did not involve a local government's challenge to a state law and dealt with statutory rather than constitutional due process rights. (*Drum, supra*, 144 Cal.App.3d at p. 783.) It did not discuss or cite any of the no-standing cases we mention above. But the next case in the line, *Selinger v. City Council* (1989) 216 Cal.App.3d 259 [264 Cal.Rptr. 499] (*Selinger*), relied on *Drum*, among other authorities, in expressly asserting an exception to the no-standing rule.

In *Selinger*, a subdivision developer obtained a writ of mandate from the superior court requiring a city to acknowledge that his subdivision map was deemed approved by operation of law—because one year had elapsed without city action on his application—under the Permit Streamlining Act (Gov. Code, § 65920), a state statute. (*Selinger, supra*, 216 Cal.App.3d at p. 263.) Among other things, the city argued that the Permit Streamlining Act violated

adjacent landowners' right to due process of law by allowing a development plan to be automatically approved without notice and a hearing. (*Selinger*, at p. 270.) The Court of Appeal agreed, rejecting the developer's argument that the city lacked standing to contest the validity of the statute. The court noted the no-standing rule as stated in *Star-Kist, supra*, 42 Cal.3d at page 6, but it cited *Drum, supra*, 144 Cal.App.3d 777 in support of making an exception. (*Selinger, supra*, 216 Cal.App.3d at pp. 270, 271.)

■ More powerfully, the court relied on the Supreme Court's doctrine of third party standing as set forth in *Singleton v. Wulff* (1976) 428 U.S. 106 [49 L.Ed.2d 826, 96 S.Ct. 2868]. In that case, the Supreme Court explained that constitutional rights usually must be asserted by the person to whom they belong, but that a litigant may assert them on behalf of a third party under exceptional circumstances. (*Id.* at p. 114.) In addition to the requirement that the litigant must sustain an injury of its own, two factual elements are relevant in determining whether the litigant should be allowed to assert a third party's rights. One tests whether the litigant and third party are related closely enough to ensure that the litigant's interest in asserting the right is genuine and its advocacy will be effective: "The first [element] is the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." (*Singleton v. Wulff, supra*, 428 U.S. at pp. 114–115.)

■ The second element concerns the reasons why the third party is not asserting or cannot assert the right in question for itself: "The other factual element to which the Court has looked is the ability of the third party to assert his own right. Even where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply. If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." (*Singleton v. Wulff, supra*, 428 U.S. at pp. 115–116.)

In *Selinger*, the Court of Appeal thought the two elements supported the city's standing. Local citizens' right to notice and a hearing was "inextricably bound up" with the city's interest in reviewing and conditioning subdivision applications on its own timetable based on local needs. (*Selinger, supra*, 216 Cal.App.3d at p. 271.) Also, there was a high obstacle to local citizens'

ability to litigate their rights: Without notice, adjacent landowners would be likely to miss the 90-day statutory deadline for legal challenges to the approval of subdivision maps. (*Ibid.*)

The Court of Appeal applied the exception to the no-standing rule again in *Central Delta Water Agency v. State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621 [21 Cal.Rptr.2d 453] (*Central Delta Water*). Two local water agencies sued the State Water Resources Control Board, mounting an equal protection challenge to discharge fees imposed on them under a state statute and regulations. (*Id.* at pp. 627–629, 630.) The Court of Appeal rejected the defendant's claim that, as political subdivisions, the agencies lacked standing to challenge the statute and regulations. It stated that the equal protection rights of the agencies' constituent water users were inextricably bound up with the agencies' duty to supply water. (*Id.* at pp. 630–631.) The court did not explain what obstacles prevented the constituents from suing on their own behalf.

We believe these courts have reasoned correctly in establishing an exception to the no-standing rule for those situations in which the usual standards for third party standing are satisfied. As previously mentioned, we acknowledge that there was no challenge to a state statute in *Drum*, and therefore the principle that a political subdivision cannot challenge the will of its creator was not implicated. Consequently, the citation of *Drum* by the *Selinger* court was a stretch. But the reasoning stated in *Selinger* and applied in *Central Delta Water* is sound. Although a local government has no equal protection rights of its own to assert against the state, there is no reason why it cannot act as a mouthpiece for its citizens, who unquestionably have those rights, where the third-party-standing doctrine would allow it.

We recognize that the third-party-standing doctrine is the key to the exception; that the doctrine is addressed to the standing of plaintiffs to sue in federal court; and that we deal here neither with the standing of plaintiffs nor with federal court. The doctrine is a sound basis for the exception in spite of these omissions. The point of the no-standing rule is to prevent local governments, whether as plaintiffs or defendants, from using certain provisions of the federal Constitution to obtain invalidation of laws passed by their creator, the state. This notion has no application where the truly interested parties—citizens or constituents of the local government entity—undisputedly do have standing and the entity merely asserts rights on their behalf.

This case falls into the exception to the no-standing rule established in these cases. As the Supreme Court explained in *Shaw*, *supra*, 509 U.S. 630, the constitutional interest at stake in an equal protection challenge to race-related changes in a voting system arises from the fact that changes of that

kind may "reinforce[] racial stereotypes and threaten[] to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." (*Id.* at p. 650.) Individual voters are entitled to assert this interest through litigation testing state laws, as they did in *Shaw*. The city's assertion of equal protection rights in this case is best understood as a means of asserting those rights on behalf of its citizens.

The requirements of third party standing are satisfied here. First, the relationship between the city and individual citizens or voters is of the appropriate kind. The city's vigorous litigation up to this point has shown its zealousness in asserting the claimed right. Plaintiffs' complaint has informed us that city voters rejected district-based elections by a large margin in a referendum in 2001, so the city likely is acting with substantial constituent support for its position. A cross-complaint filed by the individual defendants, seeking a judgment declaring the CVRA unconstitutional, shows that at least those individuals want to have the city pursue the matter on their behalf. Finally, the claimed equal protection interest of individual citizens is "inextricably bound up" (*Singleton v. Wulff, supra,* 428 U.S. at p. 114) with the city's interest in continuing its present election system.

Second, there are genuine obstacles to citizens asserting their own rights. It is not clear how a lawsuit could be structured to enable citizens to mount the facial challenge made by the city. Prior to any change in the city's voting system, whom would these citizens sue, and for what? Making citizens wait until after some remedy is ordered or adopted would involve other obstacles, including the possibility that elections could be held under the remedy before the litigation is concluded. Even after adoption of a change in the system, an individual voter's stake in the matter would be small in relation to the economic burdens of litigation, and this could be a substantial deterrent. (See *Powers v. Ohio* (1991) 499 U.S. 400, 415 [113 L.Ed.2d 411, 111 S.Ct. 1364] [venireperson dismissed in criminal case for racially discriminatory reason has little incentive to pursue costly litigation to vindicate his or her equal protection rights, so criminal defendant must be permitted to assert those rights].) While these obstacles would not make it impossible for individual voters to sue the city if some alteration in its voting system is adopted, a showing of impossibility is not required. (See *Singleton v. Wulff, supra,* 428 U.S. at p. 116, fn. 6 [dis. opn. argued that third parties must face insuperable obstacles; maj. opn. replied that "our cases do not go that far"].)

For these reasons, we reject plaintiffs' contention that defendants are not entitled to assert an equal protection challenge to the CVRA. The city is entitled to do so on behalf of its citizens.

## II. Equal protection

### A. Principles

We begin our examination of defendants' equal protection claim with a brief review of the basic constitutional principles at issue. Federal and California equal protection standards are not the same for all purposes. (See *Warden v. State Bar* (1999) 21 Cal.4th 628, 652–653 [88 Cal.Rptr.2d 283, 982 P.2d 154] (dis. opn. of Kennard, J.); *Butt v. State of California* (1992) 4 Cal.4th 668, 683, 685 [15 Cal.Rptr.2d 480, 842 P.2d 1240].) Here, however, the parties' briefs rely on federal case law and do not claim that any different standards apply to these facts under the state Constitution. We will, therefore, focus on principles developed in federal cases.

#### 1. Suspect classifications, fundamental rights, strict scrutiny, and rational-basis review

■ A state's use of a classification is subject to strict scrutiny under the equal protection clause of the Fourteenth Amendment if it is a suspect classification or if it burdens a fundamental right. (*Plyler v. Doe* (1982) 457 U.S. 202, 216–218 & fns. 14 & 15 [72 L.Ed.2d 786, 102 S.Ct. 2382].) Otherwise, the classification is subject only to rational-basis review. (*Vacco v. Quill* (1997) 521 U.S. 793, 799 [138 L.Ed.2d 834, 117 S.Ct. 2293].) Race is a suspect classification (*Johnson v. California* (2005) 543 U.S. 499, 505 [160 L.Ed.2d 949, 125 S.Ct. 1141] (*Johnson*)), and the right to vote is a fundamental right (*Kramer v. Union School District* (1969) 395 U.S. 621, 626–628 [23 L.Ed.2d 583, 89 S.Ct. 1886]) for equal protection purposes.

■ A law subject to strict scrutiny is upheld only if it is *narrowly tailored* to promote a *compelling* governmental interest. (*Johnson, supra*, 543 U.S. at p. 505.) Under rational-basis review, by contrast, a law need only bear a *rational relationship* to a *legitimate* governmental interest. (*Vacco v. Quill, supra*, 521 U.S. at p. 799.) (The third level of review—intermediate scrutiny, which applies to sex discrimination—is not at issue in this case.)

#### 2. Facial invalidity standard

■ Defendants' challenge claims that the statute is facially invalid. In *United States v. Salerno* (1987) 481 U.S. 739, 745 [95 L.Ed.2d 697, 107 S.Ct. 2095] (*Salerno*), the Supreme Court stated that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." The court explained that the fact the federal Bail Reform Act, subject in that case to a substantive due process

challenge, "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." (*Ibid.*)

Defendants assert that the *Salerno* standard does not apply here because *Salerno* was not cited in certain cases involving affirmative action laws (see, e.g., *Richmond v. J. A. Croson Co.* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706] [municipal ordinance establishing affirmative action program for city contracting]); laws creating specific election districts (see, e.g., *Shaw, supra,* 509 U.S. 630 [bizarrely shaped congressional district boundaries designed to create majority-Black districts]); and laws involving explicit use of racial segregation (see, e.g., *Johnson, supra,* 543 U.S. 499 [racial segregation of prisoners during initial evaluation]). Various justices of the Supreme Court, not amounting in any instance to a majority, have taken differing positions on the scope and applicability of the *Salerno* doctrine. (*Chicago v. Morales* (1999) 527 U.S. 41, 55, fn. 22 [144 L.Ed.2d 67, 119 S.Ct. 1849] (conc. opn. of Stevens, J., joined by Souter, J. and Ginsburg, J.) [*Salerno* formulation is dictum and need not be followed, especially by state courts]; *id.* at pp. 77–80 & fns. 1–3 (dis. opn. of Scalia, J.) [*Salerno* states the correct standard for all cases but 1st Amend. overbreadth challenges].)

The only cases of which we are aware where it has been definitively stated that a facial challenge could succeed on a showing falling short of the *Salerno* standard, however, are those where the overbreadth of a law violated the First Amendment by chilling protected speech (*Salerno, supra,* 481 U.S. at p. 745) and where a law imposed an undue burden on the right to have an abortion (*Planned Parenthood of Southern Arizona v. Lawall* (9th Cir. 1999) 180 F.3d 1022, 1026 [asserting that in *Planned Parenthood of Southern PA v. Casey* (1992) 505 U.S. 833 [120 L.Ed.2d·674, 112 S.Ct. 2791], United States Supreme Court overruled *Salerno* in context of facial challenges to abortion restrictions]). Outside these areas, California courts apply a *Salerno*-type approach to facial constitutional challenges in general. (See, e.g., *East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 709 [102 Cal.Rptr.2d 280, 13 P.3d 1122]; *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 338 [84 Cal.Rptr.2d 425, 975 P.2d 622]; *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) We agree there is no warrant for refusing to apply *Salerno* outside the First Amendment overbreadth and abortion areas until a majority of the Supreme Court gives clear direction to do so. (*Hotel & Motel Ass'n of Oakland v. City of Oakland* (9th Cir. 2003) 344 F.3d 959, 972.) Consequently, we hold that the *Salerno* standard for facial invalidation applies here, and defendants can succeed in their facial challenge only by showing that the CVRA can be validly applied under no circumstances.

### B. Analysis

With this background, the two basic reasons for rejecting defendants' challenge to the CVRA are easy to state. First, because the statute is nondiscriminatory, it is subject only to rational-basis review, not strict scrutiny; and it passes rational-basis review. Second, although the *Shaw-Vera* line of cases reveals the potential for unconstitutional applications of the statute, that potential does not show there can be no valid applications and therefore cannot establish that the statute is facially invalid. We consider these two reasons in turn.

#### 1. The CVRA is nondiscriminatory, not subject to strict scrutiny, and passes rational-basis review

Like the FVRA, the CVRA involves race and voting, but, also like the FVRA, it does not allocate benefits or burdens on the basis of race or any other suspect classification and does not burden anyone's right to vote. Like the FVRA, the CVRA confers on voters of any race a right to sue for an appropriate alteration in voting conditions when racial vote dilution exists.

The CVRA vote-dilution cause of action differs from the FVRA version in important ways, specifically, that the need to prove the possibility of creating a geographically compact majority-minority district is eliminated. The differences do not introduce a racial classification or a burden on the right to vote, however. Therefore, the facial terms of the statute are not subject to strict scrutiny. Only rational-basis review applies, and the CVRA readily passes it. Curing vote dilution is a legitimate government interest and creation of a private right of action like that in the CVRA is rationally related to it. Major portions of defendants' briefs are devoted to showing that the CVRA fails strict scrutiny. We need not address these points because strict scrutiny does not apply.

##### a. The CVRA is not a law that imposes a racial classification on individuals and then uses it to confer a burden or benefit on all

Defendants argue that strict scrutiny applies here because it applies to any statute that refers to race or calls for any sort of race-conscious remedy or other action, even if it does not affect different races in different ways. They rely on cases like *Loving v. Virginia* (1967) 388 U.S. 1 [18 L.Ed.2d 1010, 87 S.Ct. 1817] (*Loving*) and *Johnson, supra*, 543 U.S. 499, which applied strict scrutiny to state laws that employed racial classifications but burdened persons of different races equally. In *Loving*, the Supreme Court invalidated a state law forbidding persons of different races to marry one another. The law

was subject to strict scrutiny even though its burden was generally distributed. (*Loving, supra*, 388 U.S. at p. 8.) In *Johnson*, a policy of segregating state prison inmates by race during an initial evaluation period was held to be subject to strict scrutiny even though all prisoners were equally affected by it. (*Johnson, supra*, 543 U.S. at p. 506.)

What those cases hold is that a law classifying individuals by race and then imposing some kind of burden or benefit on the basis of the classification is subject to strict scrutiny even if persons of all races bear the burden or receive the benefit equally. In *Johnson*, for instance, the court rejected the state's argument that "strict scrutiny should not apply because all prisoners are 'equally' segregated." (*Johnson, supra*, 543 U.S. at p. 506.) It stated that this argument "ignores our repeated command that 'racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally.' " (*Ibid.*)

What the cases do not hold is that a statute is automatically subject to strict scrutiny because it involves race consciousness even though it does not discriminate among individuals by race and does not impose any burden or confer any benefit on any particular racial group or groups. The CVRA confers on members of any racial group a cause of action to seek redress for a race-based harm, vote dilution. The creation of that kind of liability does not constitute the imposition of a burden or conferral of a benefit on the basis of a racial classification. If the CVRA were subject to strict scrutiny because of its reference to race, so would every law be that creates liability for race-based harm, including the FVRA, the federal Civil Rights Act, and California's Fair Employment and Housing Act.

Defendants argue that these antidiscrimination laws are, in fact, subject to strict scrutiny, but cite no cases subjecting them to it. Lacking that authority, they instead cite lower court cases subjecting federal antidiscrimination laws to analysis under the congruence and proportionality test of *City of Boerne v. Flores* (1997) 521 U.S. 507 [138 L.Ed.2d 624, 117 S.Ct. 2157] (*Boerne*), which they describe as "obviously very similar to strict scrutiny." For example, the court of appeals subjected a provision of title VII of the federal Civil Rights Act to a *Boerne* analysis in *In re Employment Discrimination Litigation* (11th Cir. 1999) 198 F.3d 1305, 1319–1324.

This argument does not work. The *Boerne* test has nothing to do with strict scrutiny. It has nothing in particular to do with the equal protection clause. It is about the source of constitutional power for Congress' enactment of certain types of statutes, not the constitutional right of individuals to be free from discrimination.

Briefly, the question presented in *Boerne* was whether Congress had authority under section 5 of the Fourteenth Amendment (the amendment's enforcement clause) to enact by statute a standard for protecting the free exercise of religion that was far more stringent than the standard the Supreme Court established under the free exercise clause of the First Amendment in an earlier case. Congress claimed the action was within its power under section 5 of the Fourteenth Amendment to enforce the due process clause of the Fourteenth Amendment, which in turn incorporated the First Amendment and its free exercise clause. (*Boerne, supra*, 521 U.S. at pp. 512–517.) The court held that Congress lacked this authority because the standard Congress adopted was not congruent and proportional to the scope of the First Amendment right as the court itself had earlier defined it. (521 U.S. at pp. 519–520, 532.)

From this summary, it can be seen that the fact that an antidiscrimination law like title VII has been subjected by some courts to a *Boerne* analysis does not even remotely imply that laws of that kind violate individuals' rights against discrimination unless they pass strict scrutiny. Defendants go so far as to imply that the only reason strict scrutiny has never been applied to federal antidiscrimination laws is that the *Boerne* test applies to those laws instead; strict scrutiny is the test appropriate for state legislation while *Boerne* applies in federal law. This cannot be true. Strict scrutiny applies to all racially discriminatory laws. It does not apply to antidiscrimination laws because, like CVRA, they are not racially discriminatory.

Defendants argue that the "sky will not fall" if strict scrutiny is applied to antidiscrimination laws. It will not fall because those laws, unlike the CVRA, generally impose liability only upon a showing of intentional discrimination, and for that reason the laws would likely be upheld under strict scrutiny. This argument collapses as soon as it is applied to the FVRA. As noted above, section 2 of the FVRA does not require a showing of intentional discrimination. No court has ever suggested, to our knowledge, that strict scrutiny applies to section 2 of the FVRA and that it would fail for this reason.

Also unhelpful to defendants is the argument that *Shaw* and *Vera* stand for the proposition that strict scrutiny can be triggered by an anti-vote-dilution law even though it does not burden the rights of the White plaintiffs. Responding to Justice Souter's dissenting view in *Shaw* that race-based districting should not trigger strict scrutiny unless another race's voting strength is harmed, the *Shaw* majority explained that "reapportionment legislation that cannot be understood as anything other than an effort to classify and separate voters by race injures voters in other ways. It reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular

racial group rather than their constituency as a whole." (*Shaw, supra,* 509 U.S. at p. 650.) Similarly, in *Vera,* the plurality responded to a dissenting comment by Justice Souter—that race-based, dilution-combating districts do not harm any class of voters—by referring to "harmful and divisive stereotypes" that the use of race may foster even if it does not involve any voting-related harm to the plaintiffs. (*Vera, supra,* 517 U.S. at pp. 983–984.)

Contrary to defendants' view, these statements do not mean the CVRA is subject to strict scrutiny even though it does not confer benefits or impose burdens on any particular racial group and does not burden anyone's right to vote. They only mean that districting plans that use race as the predominant line-drawing factor—and therefore amount to segregation of voters by race— are subject to strict scrutiny. A court might wish to impose that kind of districting plan as a CVRA remedy. Even so, as we will explain, applications of the statute not involving that type of remedy are readily conceivable, so this potential problem is not a basis for a *facial* challenge.

### b. The CVRA does not deny anyone standing on the basis of membership in any group

So far we have only addressed the main thrust of defendants' argument in support of applying strict scrutiny: that the statute's reference to race is itself a racial classification. We turn next to a series of related minor arguments. The first of these is based on the trial court's view that the statute is racially discriminatory on its face because its definition of "protected class" excludes some racial or ethnic groups. The CVRA defines a protected class as persons "who are members of a race, color or language minority group, as this class is referenced and defined in the federal Voting Rights Act (42 U.S.C. Sec. 1973 et seq.)." (§ 14026, subd. (d).)

The trial court took issue with the inclusion of "language minority group" in this definition. Its objection is based on an error made in reviewing the federal standard that the CVRA incorporates. Its order quoted title 42 United States Code section 1973b(f)(1), a provision stating congressional findings on the deleterious effects of English-only elections. The provision states that "voting discrimination against citizens of language minorities is pervasive" and that "[s]uch minority citizens are from environments in which the dominant language is other than English." The trial court believed this was the federal statutory definition of "language minority group" to which the CVRA refers. On that basis, it concluded that the CVRA denies standing to English speakers. Then the trial court quoted 28 Code of Federal Regulations part 51.2 (2003), which states that "language minority group" means "persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage." The court believed this further restricted the meaning of the term,

so as to exclude, for example, speakers of Polish or Portuguese. These restrictions, the court ruled, denied standing to ethnic groups that speak the purportedly excluded languages. That, in turn, triggered strict scrutiny, which the statute failed.

In reality, the regulation the court referred to merely restated the *actual* federal statutory definition of "language minority group," which is found at title 42 United States Code section 19731(c)(3): "The term 'language minorities' or 'language minority group' means persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage." This provision uses and defines the precise phrase ("language minority group") contained in the CVRA. The only logical conclusion is that this is the definition the Legislature intended to incorporate. There is no reason to think it also meant to include the language from title 42 United States Code section 1973b(f)(1) about "environments in which the dominant language is other than English," which does not use the phrase "language minority group" and which states a congressional finding, not a definition.

Consequently, despite its name, the classification "language minority group" does not define any group in terms of language, and the trial court relied on a mistaken understanding of the statute. The term simply identifies four specific racial or ethnic groups as belonging to a protected class. The definition refers to these as racial or ethnic groups ("persons who are American Indian," etc.), not in terms of their language. As plaintiffs explain, the category "language minority group" was added to the FVRA in 1975 for the purpose of ensuring that courts would not mistakenly exclude American Indians, Asian Americans, Alaskan Natives, and Hispanics from coverage under the statute, even though each group was already included in the category "race." (See Sen.Rep. No. 94-925, 1st Sess. (1975), reprinted in 1975 U.S. Code Cong. & Admin. News, pp. 774, 814 ["The Department of Justice and the United States Commission on Civil Rights have both expressed the position that all persons defined in this title as 'language minorities' are members of a 'race or color' group . . . ."].)

The four language minority groups are, therefore, on the same footing as Whites, persons of Polish or Portuguese ancestry, or any other racial or ethnic group. In a variety of contexts, the Supreme Court has held that the term "race" is expansive and covers all ethnic and racial groups. (*Rice v. Cayetano* (2000) 528 U.S. 495, 512 [145 L.Ed.2d 1007, 120 S.Ct. 1044] [15th Amend. prohibition on abridgment of right to vote on account of race "grants protection to all persons, not just members of a particular race"]; *Saint Francis College v. Al-Khazraji* (1987) 481 U.S. 604, 610, 613 [95 L.Ed.2d 582, 107 S.Ct. 2022] [prohibition of racial discrimination in 42 U.S.C. § 1981 protects all persons from discrimination based on their

"ancestry or ethnic characteristics"; court is "quite sure" White people are protected]; *McDonald v. Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273, 280 [49 L.Ed.2d 493, 96 S.Ct. 2574] [prohibition on discrimination because of race in title VII applies to Whites and non-Whites alike].) The inclusion of "language minority groups," as defined by the statute, only reinforces the proposition that American Indians, Asian Americans, Alaskan Natives, and Hispanics are among the racial or ethnic groups that can constitute a protected class. It does not deny standing to anyone.

The trial court cited *Polish American Congress v. City of Chicago* (N.D.Ill. 2002) 211 F.Supp.2d 1098 for the proposition that "the federal courts have interpreted the definition of protected class under 42 U.S.C. [section] 1973 so as to exclude Polish speakers from those having standing to sue," but that is not what that case held. The court simply stated that Polish-Americans were not one of the four groups included in the statutory definition of "language minority group." (*Polish American Congress v. City of Chicago, supra,* at p. 1107.) The court did not consider whether Polish-Americans had standing under the FVRA as a "race" and the plaintiffs apparently did not argue that they did. A case is not authority for a proposition it did not consider. (*City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1318 [92 Cal.Rptr.2d 418].)

The trial court's view would likely justify strict scrutiny and facial invalidation if it represented a correct reading of the statute, but it does not. Even if it were a *plausible* reading of the statute, it would be both possible and necessary under the constitutional avoidance doctrine to construe it as we have: All persons have standing under the CVRA to sue for race-based vote dilution because all persons are members of a race.

### c. The CVRA is not an affirmative action law

Defendants characterize the CVRA as an affirmative action statute and rely on affirmative action cases to argue that it is subject to strict scrutiny. The CVRA is not an affirmative action statute because, unlike affirmative action laws the Supreme Court has struck down, it does not identify any races for conferral of preferences. In *Gratz v. Bollinger* (2003) 539 U.S. 244 [156 L.Ed.2d 257, 123 S.Ct. 2411], for instance, the Supreme Court applied strict scrutiny and struck down a university's affirmative action admission program. The program conferred 20 points, on a scale of 1 to 150, on applicants belonging to a specified set of racial groups. This advantage could increase a low waitlist score to an automatic admit score. (*Id.* at pp. 251, 255). In *Richmond v. J. A. Croson Co., supra,* 488 U.S. 469, the court applied strict scrutiny and struck down a city's program of affirmative action in government contracting. The program commanded that 30 percent of the

money spent on city building contracts be paid to subcontracting firms owned by members of a specified set of racial groups. (*Id.* at pp. 477–478, 511.) The CVRA does nothing similar. We cannot subject the CVRA to strict scrutiny on the ground that affirmative action programs are subject to strict scrutiny.

### d. The CVRA does not burden the fundamental right to vote

As we have said, strict scrutiny under the equal protection clause can be triggered by a classification used to burden a fundamental right, and voting is treated as a fundamental right in this context. Separately from their racial discrimination argument, defendants contend that the CVRA is subject to strict scrutiny because it "impos[es] liability on the basis of voting . . . ." This is not correct. It is true that the CVRA requires a showing of racially polarized voting as an element of liability, but that does not mean any person or group of people is held liable for voting or for how they voted. The liability is that of the government entity that maintains the voting system, and it is imposed because of dilution of the plaintiffs' votes.

A prime example of a violation of the equal protection clause through a burden on the right to vote is malapportioned districts, i.e., those that violate the one-person, one-vote rule by having unequal populations. (*Reynolds v. Sims* (1964) 377 U.S. 533, 568 [12 L.Ed.2d 506, 84 S.Ct. 1362].) The CVRA involves nothing similar. Cases reviewing districts created predominantly on the basis of race presumably are another example, even though the opinions in those cases focus on the suspect racial classification rather than on the fundamental right to vote. However, the possibility of some court imposing an unconstitutional remedy under the CVRA in some cases is not, as we have said, a basis for *facial* invalidation.

### e. The CVRA does not burden any First Amendment right

Defendants also argue that the CVRA is subject to strict scrutiny because it burdens fundamental rights protected by the First Amendment: "Voter preferences that underlie racially polarized voting, moreover, are political views protected against infringement by the First Amendment. The votes themselves are expressions of political preferences about candidates and ballot measures. Bloc voting, then, represents a coalition of political interests that lie close to the core of the freedom of political association."

Defendants may be correct in arguing that racially polarized voting constitutes political expression protected by the First Amendment. But the CVRA does not burden anyone's right to engage in racially polarized voting. It only makes racially polarized voting part of the predicate for a government

entity's liability for racial vote dilution. In doing so, it is comparable to the FVRA. The *effect* of racially polarized voting—election of monoracial city councils and the like—may be and is intended to be reduced by the application of the CVRA. But no voter has a right to a voting system that chronically and systematically brings about that effect. We do not understand defendants to argue the contrary.

### f. The fact that the CVRA addresses a racial issue does not show that the Legislature acted with an invidious purpose

A facially neutral law is subject to strict scrutiny if it was adopted for a racially discriminatory purpose. (*Miller v. Johnson* (1995) 515 U.S. 900, 913 [132 L.Ed.2d 762, 115 S.Ct. 2475].) Defendants argue that, even if the CVRA is facially neutral, it is subject to strict scrutiny because it was "enacted solely for racial purposes, i.e., to remedy racial bloc voting in at-large" voting systems. Defendants contend that plaintiffs admit this by "assert[ing] that the [CVRA] is an antidiscrimination statute intended to remedy" racially polarized voting.

This is incorrect for essentially the same reason that defendants are mistaken in claiming that the statute is subject to strict scrutiny because it contains a facial reference to race. A legislature's intent to remedy a race-related harm constitutes a racially discriminatory purpose no more than its use of the word "race" in an antidiscrimination statute renders the statute racially discriminatory. An intent to remedy a race-related harm may well be combined with an improper use of race, as in an affirmative action program that uses race in an improper way. The CVRA does not, however, have the latter component. Upon a finding of liability, it calls only for "appropriate remedies" (§ 14029), not for any particular, let alone any improper, use of race.

### g. Differences between the CVRA and the FVRA do not automatically render the CVRA unconstitutional

Defendants devote almost half of the argument portion of their brief to attempting to show that the CVRA contains "dramatic departures from the FVRA" which amount to an "extraordinary expansion of federal law." To the extent that this may be intended as an independent argument that the CVRA is unconstitutional, it is without merit. There is no rule that a state legislature can never extend civil rights beyond what Congress has provided. State law may, of course, be preempted by federal law if inconsistent with it, but defendants have not made a preemption argument. To the extent that this discussion may be intended to make the narrower point that the CVRA is not

narrowly tailored to effectuate a compelling government interest—i.e., that it fails strict scrutiny—we will disregard it, since we hold that strict scrutiny does not apply.

### 2. Potential unconstitutional applications cannot show facial invalidity

Defendants' arguments are partially based on Supreme Court cases that struck down specific redistricting plans drawn up partly to avoid racial vote dilution that might violate section 2 of the FVRA. Because those cases only address specific actions taken by states to cure racial vote dilution (i.e., the creation of particular districts), their impact here relates only to the validity of specific applications of the CVRA—applications that at this point are hypothetical. Under the facial-invalidity standard set forth in *Salerno, supra*, 481 U.S. at page 745, therefore, the cases cannot establish that the CVRA is facially invalid. (To be sure, defendants contend that none of their arguments are addressed to mere remedies issues and that all are instead addressed to the criteria for liability under the CVRA and prove that those criteria are subject to strict scrutiny. As explained earlier, they are not subject to strict scrutiny.)

*Shaw, supra*, 509 U.S. 630, was the first in this line of cases. It held, as mentioned earlier, that a redistricting plan was subject to strict scrutiny because it could not rationally be understood as anything but an effort to separate voters on the basis of race. The plurality opinion in *Vera* made a similar point. There is no doubt that any district-based remedy the trial court might impose using race as a factor in drawing district lines would be subject to analysis under the *Shaw-Vera* line of cases. In reviewing a district-based remedy, it would be necessary to determine whether race was the predominant factor used in drawing the district lines. If it was, the plan would be subject to strict scrutiny.

It is equally apparent that this does not mean the CVRA must pass strict scrutiny in order to withstand a facial challenge. Whether one potential remedy under a statute would be subject to strict scrutiny if imposed is not the test for facial invalidity of the statute. Defendants' argument, to be successful, would have to be not only that unconstitutional remedies are consistent with the CVRA, but that they are mandated by it. They are not.

## III. Gift of public funds

Although no fee motion was ever made, the trial court found the CVRA's attorney fee provision to be invalid. That provision states as follows: "In any action to enforce Section 14027 and Section 14028, the court shall allow the prevailing plaintiff party, other than the state or political subdivision thereof,

a reasonable attorney's fee consistent with the standards established in Serrano v. Priest (1977) 20 Cal.3d 25, 48–49 [141 Cal.Rptr. 315, 569 P.2d 1303], and litigation expenses including, but not limited to, expert witness fees and expenses as part of the costs. Prevailing defendant parties shall not recover any costs, unless the court finds the action to be frivolous, unreasonable, or without foundation." (§ 14030.)

Relying on *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 450–451 [123 Cal.Rptr.2d 122] (*Jordan*), the trial court ruled that this section violated article XVI, section 6, of the California Constitution, which forbids the Legislature to "make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation . . . ." The court interpreted *Jordan* to mean that "[a] lawsuit against a public entity which results in no change whatever in the status quo ante serves no public purpose, and does not constitute a valid claim against the public for attorney fee and cost purposes."

The court then applied this purported rule to a hypothetical: "If a California city has at large city council election plus one (1) voter of Alaskan native ancestry who repeatedly runs for the council and always gets just one vote (his own) and files suit under the California Voting Rights Act, he would be a prevailing party under the Act though no remedy is possible, and so be entitled to attorney fees and expenses. Defendants contend, and Plaintiffs do not dispute, that a local government cannot be required to carve an electoral district for an impossibly small number of voters (such as this hypothetical's one Alaskan native). [Citations.] While it is doubtful this hypothetical city could be sued every day under the Act in this situation, it could probably be sued every election cycle, and have to pay attorney fees over and over for a situation it cannot remedy or avoid."

The court violated two rules of constitutional decisionmaking in invalidating the section. First, a court should not decide constitutional questions unless required to do so. (*People v. Pantoja, supra*, 122 Cal.App.4th at p. 10.) Here, no party moved for attorney fees, so the validity of the fee statute was not at issue. The court should not have addressed or answered the question.

Second, the court's ability to think of a single hypothetical in which the application of a statute would violate a constitutional provision is not grounds for facial invalidation. Facial invalidation is justified only where the statute could be validly applied under *no* circumstances. (*East Bay Asian Local Development Corp. v. State of California, supra*, 24 Cal.4th at p. 709.) Circumstances in which the objection the court raises would not be present are easy to imagine. If, on remand, the court finds liability *in this case* but is unable to formulate a permissible remedy *in this case*, then the court will

have an opportunity to decide whether the application of section 14030 would be unconstitutional *in this case*. It has not had that opportunity yet. We express no opinion here on whether a fee award would be barred under those circumstances since doing so is premature.

*IV. Issues on remand*

The parties have raised several issues in this appeal that the trial court never decided and that we need not decide now. We repeat them here for convenience:

—What elements must be proved to establish liability under the CVRA?

—Is the court precluded from employing crossover or coalition districts (i.e., districts in which the plaintiffs' protected class does not comprise a majority of voters) as a remedy?

—Is the court precluded from employing any alternative at-large voting system as a remedy?

—Does the particular remedy under contemplation by the court, if any, conform to the Supreme Court's vote-dilution-remedy cases?

The court's answers to these questions will determine the scope of relief, if any, available to plaintiffs. The logical limit in one direction would be a conclusion that plaintiffs can obtain under the CVRA only the same relief that they could have obtained under the FVRA. The logical limit in the other direction would be the conclusion that, upon proof of racially polarized voting, plaintiffs will be entitled to the most appropriate remedy, among the remedies we have discussed, that does not result in unconstitutionally drawn districts under the Supreme Court's rulings.

## DISPOSITION

The judgment is reversed and the case remanded to the trial court for further proceedings. Plaintiffs shall recover their costs on appeal.

Defendants' motion to strike, filed February 10, 2006, is denied. The request for leave to submit supplemental briefing included in the motion to strike is granted and the supplemental brief incorporated in the motion is deemed filed.

The following requests are granted: Motion of Appellants Requesting Judicial Notice (filed September 15, 2005); Supplemental Motion of Appellants Requesting Judicial Notice (filed January 31, 2006); Second Motion of Respondents Requesting Judicial Notice (filed February 6, 2006); Request for Judicial Notice contained in defendants' Answer to Brief of Amici Curiae Common Cause and FairVote (filed March 22, 2006); Third Motion of Respondents Requesting Judicial Notice (filed July 20, 2006).

Harris, Acting P. J., and Cornell, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 21, 2007, S149500.