Filed 8/5/20 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PICO NEIGHBORHOOD ASSOCIATION et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF SANTA MONICA, <br><br> Defendant and Appellant. | B295935 <br> (Los Angeles County <br> Super. Ct. No. BC616804) <br><br> **ORDER MODIFYING THE OPINION AND DENYING THE PETITION FOR REHEARING** <br><br> **[NO CHANGE IN JUDGMENT]** |

THE COURT:

The opinion in the above-entitled matter filed on July 9, 2020 is modified as follows:

On page 32, the first paragraph is deleted and replaced with the following:

First, Pico argued the Act contains no dilution element at all. In its 95-page brief, Pico devoted only one sentence to this argument. An amicus brief also argued this point. At oral argument, however, Pico "for purposes of this argument" abandoned this argument, and for good reason.

There is no change in the judgment.

The petition for rehearing is denied.

_____

BIGELOW, P. J.          GRIMES, J.          WILEY, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PICO NEIGHBORHOOD ASSOCIATION et al., | B295935 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC616804) |
| v. | |
| CITY OF SANTA MONICA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge. Reversed.

Lane Dilg, City Attorney, George Cardona, Special Counsel; Gibson, Dunn & Crutcher, Theodore J. Boutrous Jr., Marcellus A. McRae, Kahn A. Scolnick, Tiaunia N. Henry and Daniel R. Adler for Defendant and Appellant.

Cole Huber and Derek P. Cole for League of California Cities and California Special Districts Association as Amici Curiae on behalf of Defendant and Appellant.

Strumwasser & Woocher, Bryce A. Gee and Caroline C. Chiappetti for The Santa Monica Transparency Project as Amicus Curiae on behalf of Defendant and Appellant.

Shenkman & Hughes, Kevin I. Shenkman, Mary R. Hughes, Andrea A. Alarcon; Law Office of Robert Rubin, Robert Rubin; Goldstein, Borgen, Dardarian & Ho, Morris J. Baller, Laura L. Ho, Anne P. Bellows, Ginger L. Grimes; Parris Law Firm, R. Rex Parris, Ellery S. Gordon; Law Offices of Milton C. Grimes and Milton Grimes; Schonbrun Seplow Harris & Hoffman, Paul Hoffman and John Washington for Plaintiffs and Respondents.

Panish Shea & Boyle and Brian Panish for Richard Polanco, Sergio Farias, Juan Carrillo, Richard Loa and Austin Bishop as Amici Curiae on behalf of Plaintiffs and Respondents.

Hogan Lovells US, Ira M. Feinberg, Zach Martinez, Patrick C. Hynds and Joseph M. Charlet for FairVote as Amicus Curiae on behalf of Plaintiffs and Respondents.

———————————

A neighborhood organization and a resident sued the City of Santa Monica, which uses at-large voting to elect its City Council. The plaintiffs claimed this system discriminated against Latinos, which is the term all parties use. After a bench trial, the trial court agreed and ordered the City to switch to district-based voting. We reverse and enter judgment for the City because the City violated neither the California Voting Rights Act nor the Constitution.

I

We describe the setting.

A

At the time of trial, about 90,000 people lived in the City of Santa Monica, which is the defendant and appellant in this case and which we call the City. Latinos then comprised about 16

2

percent of the City's total population and 13.64 percent of the City's citizen-voting-age population.

The plaintiffs and respondents are Pico Neighborhood Association and Maria Loya.

Pico Neighborhood Association is an organization dedicated to improving conditions and advancing the interests of the Santa Monica neighborhood near Pico Boulevard. Residents formed the association in 1979 to help neighbors participate fully in the democratic process and to ensure a safe and secure community. Members advocate for neighborhood interests before the Santa Monica City Council.

Maria Loya is a Pico neighborhood resident and a Pico Neighborhood Association board member. Loya ran for the Santa Monica City Council in 2004 and lost. Loya's husband, Oscar de la Torre, is a leader of the Pico Neighborhood Association. Oscar de la Torre won Santa Monica-Malibu Unified School District Board races in 2002, 2006, 2010, 2014, and apparently in 2018 as well. He ran for the Santa Monica City Council in 2016 and lost.

We refer to the respondents collectively as Pico unless otherwise specified.

B

This case concerns two alternative election methods: at-large versus district voting. At-large voting is city-wide. District voting is also called ward voting: "district" and "ward" are synonyms. District voting would divide the City into the number of districts (or wards) corresponding to the number of council members.

The City now uses at-large voting to elect its seven-member City Council. The City holds elections every two years. National presidential elections are every four years. In those years, four

3

council seats are up for election: each voter can cast four votes. In between national presidential contests are elections for Governor. For elections held those years, voters each get three votes for the three council seats at stake. Depending on whether there are three or four seats open, the top three or four candidates receiving the most votes win. Santa Monica also uses at-large voting for its School, Rent Control, and College Board elections, but this suit targets only City Council elections.

District voting differs from at-large voting. In district voting, each voter casts one vote and votes to select only one candidate to represent that district.

C

Over the years the City has debated and used both at-large and district voting. We review this history, which has six stages. We pay particular attention to 1946 and 1992: the years in controversy, which are stages three and five. But first we begin at the beginning, in 1906.

1

A 1906 charter divided the City into seven districts, called wards. Voters in each ward voted for one council member to represent the ward.

2

In 1914, the City switched from wards to at-large elections. Voters in this new system elected three commissioners at large. Each commissioner occupied a different and specialized post: public safety, public works, and finance. The City held separate elections for each post. Voters could cast only one vote for one candidate in each election.

4

3

In 1946, the City changed its at-large voting into the system it uses today. The events of 1946 are crucial in this lawsuit and bear careful attention.

How can we tell what happened in 1946? What are the sources of evidence? Apart from the proposed charter and documents with voting results, the trial court considered only one direct source of evidence about events in 1946. This direct source was 1946 Santa Monica newspaper excerpts. In other words, no trial witnesses testified about what they saw or heard in 1946.

The 1946 newspaper excerpts reveal the following.

In a nutshell, the City in 1946 embarked upon charter reform. A deliberative body called the Board of Freeholders debated and crafted a proposed new charter. Supporters and opponents campaigned about it, and then voters overwhelmingly approved it.

We present the events of 1946 in more detail.

Voters elected a 15-member Board of Freeholders charged with proposing a new city charter. The Freeholders issued their charter proposal on August 15, 1946. They proposed the City continue at-large elections but expand the number of council members from three to seven. They proposed eliminating the three specialized posts in favor of seven equal city council members, each with a general and comprehensive portfolio. Voters would elect three or four council members, depending on the year, and correspondingly would cast up to three or four votes.

The new charter proposal would also create the staff office of city manager. For this reason, news articles in 1946

sometimes called the Freeholders' proposal a "council-manager" form of government.

The record gives us limited demographic information about the City in 1946. A table lists the total 1946 population as 67,473, with "White or Anglo" as 64,415. The other categories are "Black," "Asian," and "Latino," but there is no breakdown within these columns until later years. Today, there is no majority racial or ethnic group in California; statewide, every group is a minority. (*Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 666 (*Sanchez*).) The recent situation has been different in Santa Monica; in 2010, the white or anglo population was about 70 percent of the City's total. The situation was also different in Santa Monica in 1946, when the white or anglo population constituted about 95.5 percent. We refer to 1946 Santa Monicans in the 4.5 percent group as minorities.

All minority leaders in our record supported the proposed change in 1946. None opposed it. This fact is of dominating significance in this lawsuit about race discrimination, and so we elaborate.

Jean Leslie Cornett was Secretary to the Board of Freeholders and signed an advertisement supporting the charter. Cornett met with members of the National Association for the Advancement of Colored People (NAACP) and explained that the Freeholders' charter proposal would increase the opportunity for minority group representation by two and a half because it expanded the City Council from three to seven members.

Freeholder Vivian Wilken was a member of the NAACP and an organizer in the Santa Monica Interracial Progress Committee, which worked toward "[r]espect for human dignity through common appreciation of the worth of each individual

regardless of racial origin." Wilken also signed on to an advertisement supporting the charter.

Seven members of the Committee for Interracial Progress endorsed the charter amendment in newspaper advertisements. Among them was Reverend W.P. Carter, the preeminent African-American civil rights leader in Santa Monica in the 1940s, 1950s, and 1960s. Reverend Carter was a past president of the NAACP in Santa Monica.

Blanche Carter, Reverend Carter's wife and the first African-American Santa Monica school board member, signed an advertisement supporting the charter. So did other African-American, Latino, and Jewish community leaders.

No member of the Committee for Interracial Progress opposed the charter. No minority leaders, groups, or residents opposed the charter.

By a vote of 15,132 to 6,512, voters approved the charter on November 5, 1946.

4

In 1975, voters rejected Proposition 3, which, among other items, proposed the City switch back to district voting.

5

The year 1992 was another focus of attention in this case. We review 1992 events in detail.

As with 1946, the direct evidence about 1992 came strictly from historical records. There were only two direct sources of evidence: a written commission report and a videotaped City Council meeting where the report was discussed.

One fact witness was present at the 1992 meeting. This witness was former City Councilmember Antonio Vazquez. Vazquez was on the City Council in 1992 and was one of the

7

seven council members who voted on the decision the trial court condemned.  Vazquez testified at trial by deposition.  But as far as the record shows, Pico never asked Vazquez whether the City's decisionmaking in 1992 was for the purpose of discriminating against Latinos.

So the lone eyewitness did not weigh in on the crucial equal protection issue because Pico refrained from asking him about it.

As a result, only two items of evidence directly show what happened in 1992.  These two direct sources are the report and the videotape.  First we give an overview of what they reveal.  Then we delve into detail.

The overview is the City did not change its electoral system in 1992.  A special study commission concluded the status quo should change but could not achieve consensus on what the change should be, and so recommended inaction and further research.  The City Council debated the matter at length and could not agree on anything except more study.  In short, 1992 was a year of dissatisfaction, study, debate, and no change.

Now we plunge into more detail.  We begin with the work of the Charter Review Commission, and then describe the City Council meeting where the Council discussed this Commission's report.

a

We describe the special study commission and its work.

The City Council appointed the 15-member Charter Review Commission to analyze a set of questions about the city charter, including alternatives to the at-large system the City adopted in 1946.

The Commission issued its report in June 1992.  The report is more than 90 pages and it covered more than a dozen topics,

including term limits, selection of the city attorney, competitive bidding, official bonds, council meeting protocols, and so forth.

The first and largest topic in the report was the pertinent one here: the at-large election method for the City Council. The Commission comprehensively explored five voting options: at-large voting, district voting, mixed voting systems, and two types of proportional representation: single transferable votes and cumulative voting.

The Commission emphasized its dominating goal of racial justice. "The central issue, in the Commission's view, is not one of having Council members who are ethnic, but of empowering ethnic communities to choose Council members, and on this criterion, the at-large system is felt to be inadequate." The Commission sought to "distribute empowerment more broadly in Santa Monica, particularly to ethnic groups . . . ." The Commission also wrote district voting was not "clearly the most empowering option to insure minority influence in Santa Monica's political life." It decried "the consequence of disempowering ethnic minorities." The Commission underlined the virtue of bringing "Latinos much closer to placing their choice on City Council."

The Commission recounted its efforts to obtain enlightened perspectives on the issues. It met with Richard Fajardo, a former attorney with the Mexican American Legal Defense and Educational Fund (MALDEF), as well as with members of the NAACP and Citizens United to Reform Elections (CURE), which was Santa Monica's election reform advocacy group. Three Commissioners were members of CURE.

The Commission consulted scholarship about electoral systems. "A substantial part of this material [focused] on ethnic

9

representation questions." A historian who later served as Pico's expert wrote a report to the Commission stating his view that the City adopted its at-large system with racially discriminatory intent in 1946.

The Commission was dissatisfied with the at-large status quo but could not agree on what to do about it. After reviewing the options, the Commission advised the City Council to delay action and to gather more information.

A bare Commission majority favored some type of proportional voting but recognized these systems were unusual, complex, and largely untested. Apparently the City would have to write software from scratch. As alternatives to proportional voting, the Commission recommended that—if the City Council decided *not* to propose a proportional method to the voters—both a district system and a hybrid district/at-large system should be "seriously considered."

Five of the 15 Commissioners favored district voting as their first choice.

Most Commissioners reported "that we were making our decision with less information than we would have liked to have had before us . . . ." The Commission "strongly" suggested further study, "utilizing experts in this area as needed."

b

The City Council met to consider the Commission's report on July 7, 1992. This public meeting began at 7:40 p.m. and ended at 2:00 a.m. Our record contains a video of the entire meeting.

The Council consisted of Mayor Ken Genser, Mayor Pro Tempore Judy Abdo, and members Robert T. Holbrook, Herbert Katz, Kelly Olsen, Antonio Vazquez, and Dennis Zane.

10

Commission chair Nancy Greenstein presented the report. Other Charter Review Commissioners and members of the public commented about different election systems and then responded to the City Council's questions, which were many and searching.

Greenstein noted the election method question was the most difficult for the Commission. She said the majority of Commissioners recommended the City move away from the at-large system, but Commissioners were unsure about district voting as a replacement system. While a majority recommended the proportional method, this method admittedly was complex and had drawbacks. The Commissioners did not have enough time to study it. Only five of the 15 Commissioners favored district voting. Ultimately, the Commission was "not giving [the Council] a definitive yes on any system," but was recommending either staff or a small committee continue to study the proportional method and to provide more information about the proper technique for counting votes.

Commissioner Chris Harding was in the Commission's minority and supported districting. Harding urged the City Council to "do a thorough investigation and gather further information and certainly open this up for more public discussion." He did not "expect [Council] to make a decision tonight about this" and encouraged the Council to consider the lack of diversity among past mayors and council members.

George Hickey, another Commissioner, urged the Council to call on members of the public in its deliberations, especially those who served on the Commission.

Some speakers favored districts. They argued the City had never elected a council member from the Pico neighborhood, which had the highest African-American and Latino population

concentration. They wanted neighborhood-specific representatives.

Other speakers opposed a district system out of a desire to have all City Council members represent all residents.

Council members actively questioned speakers and discussed the issues.

For instance, Councilmember Holbrook asked Commission chair Greenstein if the Commission explored whether a hybrid district/at-large system would provide any additional advantage for underrepresented people to win elections.

Greenstein responded the Commissioners were not particularly interested in the hybrid system. Some thought the hybrid system would corrupt the district system and others preferred the proportional system. Some also thought the hybrid system still would dilute minority representation by making an intentionally-formed minority district larger. Councilmember Zane responded the hybrid system would only do so if the City did not expand the number of districts.

Councilmember Katz was concerned a district system would lead to "total provincialism" and believed each council member should represent the city as a whole.

Katz asked several speakers how they felt about a hybrid system's ability to balance the needs of individual neighborhoods with those of the City while intentionally forming districts to empower minorities. Katz emphasized the City would have to pick the districts, because having an all-white district would not help minorities. Katz gave an example of having neighborhoods like Pico become districts while keeping other seats at-large, and asked whether such a system would increase minority

representation and still keep the Council focused on overall City politics.

Richard Fajardo answered Katz. Fajardo was a former MALDEF attorney who had worked on voting rights cases and had advised the Commission. Fajardo told Katz it would depend on whether the at-large representatives could still dilute the power of the district representatives. Fajardo said the hybrid system had been used as a compromise in a number of voting rights cases.

Councilmember Holbrook expressed concerns about how districting would work if minority communities were spread out in their geographically small city, making it difficult to carve out districts.

Councilmember Vazquez favored districts, but noted the report raised a troubling prospect: a district system could pit minorities against each other.

Councilmember Zane spoke as an advocate of affordable housing. Zane asked Fajardo about the effect of district voting on the prospects for affordable housing projects. Zane worried every representative in a district voting system would take a Not-In-My-Backyard (NIMBY) view of low-cost housing projects, meaning every representative would oppose these projects and thus doom them. We quote Zane's lengthy question verbatim for reasons that later will be apparent. We italicize the one sentence that emerged as an issue.

"This is a question about districts that goes less to the sort of legal representational issues, more to some kind of policy concerns that I want to hear if you have had any experience or reflection on. The concern I have about districts sort of somewhat mirroring the parochial kinds of concerns that Mr. Katz alluded

13

to has to do with, issues like affordable housing and issues that are not simply the representational issues of the poor, for example, and historically discriminated-against minorities but are the sort of substantive needs. One of the experiences of people I have been acquainted with, who have made a transition from at-large systems to district systems, is that it becomes very difficult to get affordable housing projects passed. And the reason is, each council member has, for one thing, become something of a case manager of services rather than a policy maker. Two, each council member feels more vulnerable to any neighborhood protest, and affordable housing frequently, if not always, brings some level of neighborhood protest. In some of the communities I am aware of, they simply don't get affordable housing projects approved any more. Because every council member is afraid of them. *And so, you gain the representation but you lose the housing.* Now, do you have experience with that?"

Fajardo agreed "that has been an issue and it has been a problem" because "even within the Latino community" a debate between homeowners and renters would have to continue. But Fajardo's concern was the inability of minority communities to elect their preferred candidates to boards and commissions.

Zane replied "I just want us to make sure we, you know, don't try to solve our representational issues at the expense of our, the needs of the poor or things like affordable housing. We need a system we can choose both."

Zane returned to his affordable-housing theme about 45 minutes later, in response to Doug Willis's public comments. Willis, who was African-American and one of the 15 members of the Charter Revision Commission, said he belonged to CURE and

represented the Santa Monica-Venice chapter of the NAACP. Willis said he lived in the Pico neighborhood and supported district voting.

Zane responded to Willis. Zane acknowledged district voting has some advantages, but asked Willis if he, in turn, would acknowledge some of the disadvantages of district voting. Zane repeated his concern about whether district voting would end affordable housing projects by making district representatives frightened of the neighborhood protests that usually accompanied such proposals.

Willis replied the Pico area had the most affordable housing in the City.

Zane said "I'm not trying to identify a particular district."

Rather, Zane contrasted Santa Monica's willingness to approve affordable housing projects with communities that "proclaim similar progressive philosophies about housing" but cannot get affordable housing approved. Zane said the way these other places explained it was that the district council members are "freaked out" by every neighborhood uprising on any issue— not just affordable housing, but also "social service centers" and the like. "A small district makes those protesters look very powerful." Zane asked Willis, "how do we combat that" if we adopt district voting?

Willis understood Zane's point but said "I don't tend to agree" and said no more, thus ending their exchange.

After hours of further discussion, the council members voted four to three not to put a district election system on the 1992 ballot. They did agree, unanimously, to gather more information about the hybrid system and the single-member district system.

15

The record evidence was that, thereafter, the City's staff did provide the City Council with further information about hybrid voting, at-large voting, and district voting.

In this way, Santa Monica did not change from at-large voting in 1992.

6

In 2002, voters rejected ballot measure HH, which included a proposal to switch back to district elections.

7

Because of its history since 1946, Santa Monica now has an at-large City Council composed of seven council members. At the time of trial, two of these council members self-identified as Latinos: Antonio Vazquez (later replaced by Ana Maria Jara) and Gleam Davis. Another council member named Terry O'Day lived in the Pico neighborhood. During trial, then, the percentage of self-identified Latinos on the City Council was about 29 percent, which is about twice the percentage of voting-age Latinos in Santa Monica.

D

Now we turn to this lawsuit. Its pertinent procedural history began with Pico's operative complaint of February 23, 2017, alleging the City's at-large election system violated the California Voting Rights Act and the California Constitution. Pico alleged those who adopted and maintained the at-large system did so intentionally to dilute Latino voting power and to deny Latinos effective political participation in City Council elections. Pico also alleged the at-large system prevented Latino residents from electing candidates of their choice or influencing election outcomes.

16

Seven expert witnesses and nine fact witnesses testified during a bench trial beginning August 1, 2018, and ending September 13, 2018. There were 24 days of testimony. Trial days usually started between 9:30 and 10:30 a.m. and ended between 3:00 and 4:00 p.m., with a 90-minute lunch break, meaning that a "trial day" ranged between three and five hours. The trial court handled other cases for the balance of each day.

The trial devoted more time to experts than to fact witnesses. Pico's main expert, a historian, testified on 10 of the 24 days, for six full days and four partial days. Another Pico expert and two City experts each testified on three days, with one of them testifying for three full days.

Fact witnesses testified more briefly. Only one witness was present at the 1992 meeting and could testify about what he witnessed. That was former Councilmember Antonio Vazquez but, as noted above, Pico avoided asking Vazquez whether the City Council's 1992 vote had been for the purpose of discriminating against Latinos. Nor did Pico seek to present testimony from Richard Fajardo, Doug Willis, or anyone else present when Zane spoke words that decades later Pico would contend were racist. So no eyewitnesses testified from personal knowledge gained in 1992 about the purpose of the City's actions that year.

Rather the factual testimony was about other topics. Plaintiff Loya testified for two partial days, as did her husband Oscar de la Torre. Each of the other fact witnesses testified for one or two days.

On November 8, 2018, the trial court issued a tentative order stating the court was ruling in Pico's favor on both causes of action. This order did not provide legal reasoning, but rather

set a remedies hearing and a briefing schedule. In response to the City's request for a statement of decision, the court ordered Pico to prepare one.

On December 12, 2018, the court prohibited the City from holding any at-large City Council elections and ordered future elections to be district-based elections, according to an attached map.

Pico asked the trial court to clarify this order because, among other reasons, the court's map defined only one district rather than the seven necessary for the City's seven-member council to be elected through district voting. At a hearing, the trial court stated: "I am thinking maybe it makes sense to go with the seven districts [drawn by Pico's expert]; order the special elections; run with your appeal; and we will see where we end up."

The court ordered Pico to include seven districts in its proposed statement of decision and proposed judgment, and again stated, "We will let it run and see where it goes in the court of appeal."

On January 3, 2019, Pico filed its proposed statement of decision and proposed judgment. The City filed objections, including some 200 objections to the proposed statement of decision. The court sustained eight objections and overruled the rest. The trial court's statement of decision and judgment thus basically mirrored Pico's proposals. This ruling, issued on February 13, 2019, was Pico had proved the City violated the California Voting Rights Act as well as the equal protection clause of the California Constitution.

Using data provided by a historian, the trial court found "a consistent pattern of racially-polarized voting" in the City's at-

large elections. The historian analyzed seven City Council elections between 1994 and 2016 involving at least one Spanish-surnamed candidate, and estimated support from Latino voters and support from non-Hispanic white voters. The historian presented analyses showing a statistically significant difference in how non-Hispanic white voters and Latino voters voted in six of the seven elections. In all but one of those six elections, Latino voters cohesively supported the Spanish-surnamed candidates. According to the historian, "in all but one of those six elections, a Latino candidate received the most Latino votes, often by a large margin. And in all but one of those six elections, the Latino candidate most favored by Latino voters lost, making the racially polarized voting legally significant."

The trial court rejected the City's argument the candidate's race was irrelevant under the California Voting Rights Act. The court ruled it would consider only Spanish-surnamed candidates to be Latino candidates. Although City Councilmember Gleam Davis testified she "considers herself Latina because her biological father was of Hispanic descent," the court did not count Davis as Latina, because not enough people knew about Davis's ethnicity.

The trial court found several qualitative factors supported its finding of legally significant racially polarized voting, including the City's history of discrimination against Latinos.

At trial, the City argued the law required Pico to show vote dilution—not simply racially polarized voting—to prove the at-large system violated the California Voting Rights Act. The trial court acknowledged the City's argument that dilution was a separate liability element and held that, assuming dilution was a separate element, the evidence still showed the system diluted

19

Latino votes. The court noted "it is impossible to predict with certainty the results of future elections" but found the evidence showed "some alternative method of election would enhance Latino voting power."

The trial court also found the at-large system violated the California Constitution's equal protection clause because the City adopted the system with discriminatory intent in 1946, and maintained it with discriminatory intent in 1992. For both years, the trial court analyzed five factors from *Arlington Heights v. Metropolitan Housing Corp.* (1977) 429 U.S. 252, 266–268 to determine whether the City adopted or maintained the at-large system with discriminatory purpose: the impact, the historical background, the specific sequence of events leading to the decision, departures from the normal procedural sequence, and legislative history.

The trial court acknowledged minority leaders in 1946 favored the Freeholders' proposal and none publicly opposed it. The court nonetheless concluded "all understood that at-large elections would diminish minorities' influence on elections." The court found "the evidence of discriminatory intent outweighs the contrary evidence."

Analyzing the same factors, the trial court concluded the City in 1992 deliberately decided "to maintain the existing at-large election structure because of, and not merely despite, the at-large system's impact on Santa Monica's minority population." The trial court based its finding primarily on the Charter Review Commission's report, the July 7, 1992 City Council meeting, and Councilmember Zane's statements about affordable housing at the meeting.

20

Having basically adopted Pico's statement of decision, the court likewise adopted the district map drawn by a Pico expert as the appropriate remedy.  The court found it would "likely be effective, improving Latinos' ability to elect their preferred candidate or influence the outcome of such an election."  The trial court ordered the City to implement district-based elections for its City Council in accord with the seven-district map presented at trial.

The City appealed.  It also asked the trial court to confirm the final judgment operated as a mandatory injunction that the appeal automatically would stay, or in the alternative to stay a portion of the judgment pending appeal.  The trial court denied both requests.

The City petitioned the Court of Appeal for a writ of supersedeas, requesting an immediate stay.  We granted the petition.

Based on its trial victory, Pico has asked the trial court to order the City to pay it about $22 million in attorney fees and costs.  The trial court set a future hearing on this request.

II

This case presents two legal issues.  The first is whether the City violated a statute.  The second is whether it transgressed the California Constitution.

This section concerns the statute.  The next section, section III, tackles the constitutional issue.

To summarize our statutory analysis, the trial court misinterpreted the statute.  Properly interpreted, the statute imposes a dilution element Pico failed to prove.  The City's actions complied with the statute.

21

We independently review issues of statutory interpretation. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247.)

The next section sketches the background for the statute, which concerns at-large and district voting. The following sections describe and apply the statute.

A

As context for our statutory analysis, we sketch the background against which this statute operates.

People debate whether at-large voting or district (or "ward") voting is the superior form of democracy. Opinions vary.

Some of the briefing in this case speaks to this point. Amicus League of California Cities is an association of 478 cities in California. Joining it in this brief is the California Special Districts Association, which consists of over 900 special districts throughout California. The special districts provide Californians with services relating to police, fire, roads, harbors, waste, sewage, mosquitoes, libraries, parks, and similar matters.

This amicus brief presents the perspectives of these 1,000 plus California jurisdictions. This brief is not a source of facts from which a court could make factual findings. Lawyers wrote this brief, and like any brief, it is merely legal advocacy on behalf of those with an interest in the outcome of this case.

The amicus cities and special districts all hold elections. These entities take different views about at-large voting versus district voting. They recognize at-large voting can dilute minority voting power *in certain circumstances*, and that, when this occurs, it is bad. They argue, nonetheless, that legitimate debate remains over the merits of the two methods.

The amicus brief claims some member district and city officials support at-large elections. The main idea is at-large

22

voting elects representatives devoted to the welfare of the whole. Supporters say the district alternative leads to ward politics.

"Ward politics" is a term with a possibly pejorative connotation. (See, e.g., Plunkitt, Plunkitt of Tammany Hall (Project Gutenberg 2013) ch. 6 & 23 [talks given by George Washington Plunkitt around 1905].)

Some abuses of ward politics are a matter of record here. Santa Monica's Charter Revision Commission noted ward elections—also called district elections—were the rule in U.S. cities at the end of the 19th century. Widespread graft and corruption in city politics then led to reforming upheaval in municipal governance and swept away ward and district elections.

The record in this case also shows that, by 1989, at-large elections had become the norm in California. Among California cities, for instance, 205 cities then used at-large voting while only 15 cities preferred district voting. In 2014, most local governance bodies in California were elected on an at-large basis. (*Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781, 788 (*Jauregui*).)

Another aspect of district voting is its requirement of drawing district lines, which in turn poses the issue of gerrymandering. (See *Reynolds v. Sims* (1964) 377 U.S. 533, 578–579.)

Yet, according to amici League and the special districts, today some among their members take a contrary view and favor *district* voting as the more democratic approach.

Officials who favor district voting say they believe their connections to distinct communities allow them to represent those communities better by responding more attentively to local and particular interests.

23

We also note that, for many decades, esteemed civil rights leaders have observed shifts from ward to at-large elections can deprive minority voters of fair and effective procedures for electing candidates of their choice. (E.g., Days & Guinier, *Enforcement of Section 5 of the Voting Rights Act* in Minority Vote Dilution (Davidson edit., 1984) p. 169.)

Amici League and special districts assert their organizations do not favor one system or the other. Rather they hold there are legitimate arguments for each system. Reasonable people can differ on the choice between district and at-large voting.

B

The Legislature weighed in on the debate about district voting by passing the California Voting Rights Act, which took effect in 2003. The Act consists of eight sections of the Elections Code: sections 14025 to 14032. Henceforth we refer to this statute as the Act. All further statutory references are to the Elections Code unless otherwise indicated.

The Act created a private right of action against political subdivisions of the state of California.

This case requires us to construe the Act. We begin with its language and structure in our quest to ascertain its purpose. Our central goal is to effectuate that purpose. We must interpret the statute's words in context, keeping in mind the statutory purpose. We start by considering the ordinary meaning of the statutory language, the language of related provisions, and the structure of the statutory scheme. If the language of a statutory provision remains unclear after this analysis, we may explore extrinsic sources like legislative history. (*Scholes v. Lambirth Trucking Co.* (2020) 8 Cal.5th 1094, 1102–1103 (*Scholes*).) We

24

construe the statutory words in context so we can harmonize individual sections by considering the provision at issue in the context of the statutory framework as a whole. (*Kim v. Reins Internat. Cal., Inc.* (2020) 9 Cal.5th 73, 83.)

The Act requires plaintiffs to satisfy five elements to make out a claim:

1. Protected class;
2. Resident;
3. At-large voting;
4. Racially polarized voting; and
5. Dilution.

*Protected class.* Element one requires plaintiffs to prove membership in a protected class. (§§ 14032 [stating this element], 14026, subd. (d) [defining protected class].) A protected class is a class of voters who are members of a race, color, or language minority group, as defined in the federal Voting Rights Act (52 U.S.C. § 10301 et seq.). (§ 14026, subd. (d).)

*Resident.* Element two requires plaintiffs to prove they reside in the political subdivision they are suing. (§§ 14032 [stating this element], 14026, subd. (c) [defining political subdivision].) A political subdivision is a geographic area of representation created for the provision of government services, and includes general law cities and charter cities. (§ 14026, subd. (c).)

*At-large voting.* Element three requires plaintiffs to prove the political subdivision used an at-large method of electing members to the governing body of the political subdivision. (§§ 14027 [stating this element], 14026, subd. (a) [defining at-large method of election].) At-large voting includes any of the following election methods: (1) one in which voters of the entire

jurisdiction elect members to the governing body; (2) one in which candidates must reside in given areas of the jurisdiction and voters of the entire jurisdiction elect members to the governing body; and (3) one that combines at-large elections with district-based elections.  (§ 14026, subd. (a).)

*Racially polarized voting.*  Element four requires plaintiffs to prove racially polarized voting occurred in the political subdivision's elections.  (§§ 14028 [stating this element], 14026, subd. (e) [defining racially polarized voting].)  Racially polarized voting is voting in which a protected class's electoral preferences are different from those of the rest of the electorate in a legally significant way.  (§ 14026, subd. (e).)

*Dilution.*  Element five requires plaintiffs to prove the political subdivision's at-large election method impaired "the ability of a protected class to elect candidates of its choice or its ability to influence the outcome of an election, as a result of the *dilution* or the abridgment of the rights of voters" who belong to a protected class.  (§ 14027, italics added.)

Section 14030 is a one-way attorney fee provision:  the prevailing plaintiff party is entitled to fees and costs, so long as the plaintiff is not the state or a political subdivision.  There is no fee provision for prevailing defendants.  Prevailing defendants do not recover costs unless the action was frivolous or the like.  (See generally *Rey v. Madera Unified School Dist.* (2012) 203 Cal.App.4th 1223, 1235–1245.)

The Act defines only five of its statutory terms.  (§ 14026, subds. (a)–(e).)  The Legislature left a number of statutory terms undefined, as we explain below.

26

The City does not appear to contest that Pico has satisfied elements one, two, or three, but it does take issue with the trial court's finding of racially polarized voting and dilution.

C

This case turns on element five, which is the dilution element. We thus do not consider element four.

As we have just recounted, the dilution element required Pico to prove the City's at-large method impaired Latinos' ability to elect candidates of their choice or to influence the outcome of an election as a result of the *dilution* or the abridgment of Latino voting rights. (§ 14027.)

We focus on the word dilution, as does Pico. In defending its trial court victory, Pico in its brief to us uses a form of the word *dilution* more than 40 times. It uses a form of the word abridgement only once, and then only in passing. We focus on the issue Pico has posed.

The Legislature decided not to define the word "dilution." We must decipher what the Legislature meant this word to mean. We approach this interpretative work with the standard tools of statutory construction. We start by considering the ordinary meaning of the statutory language. (*Scholes*, *supra*, 8 Cal.5th at p. 1103.)

Dilution is a familiar word with a plain meaning. Dilution is the act of making something weaker by mixing in something else. (The Random House Dict. of the English Language (2d ed. unabridged 1987) p. 554 ["to reduce the strength, force, or efficiency of by admixture"].)

Pouring a quart of water into a quart of milk, for instance, dilutes the milk to half strength. Diluting the milk weakens its nutritional value.

This familiar concept applies to electoral results.

Many techniques can manipulate a voting system to dilute the ability of particular groups to achieve electoral success. Both district voting and at-large voting can be mechanisms of mischief.

In a district voting system, for instance, one can draw district lines to divide a group's supporters among multiple districts so they fall short of a majority in each district.

That is "cracking." (*Gill v. Whitford* (2018) ___ U.S. ___, ___ [138 S.Ct. 1916, 1923–1924] (*Gill*); cf. *Garza v. County of Los Angeles* (9th Cir. 1990) 918 F.2d 763, 769 [county intentionally fragmented Latino population to dilute that vote].)

Or one can draw district lines to concentrate a group into a few districts so the group wins there by overwhelming margins but achieves less overall success than if different line-drawing spread the group more evenly through a larger number of districts.

That is "packing." (*Gill, supra*, 138 S.Ct. at pp. 1923–1924; cf. *Georgia v. Ashcroft* (2003) 539 U.S. 461, 470, 481, 486–488 [explaining packing and unpacking].)

At-large elections are another possible method for diluting voting power and curbing electoral success, under particular conditions. At-large voting is not a per se violation of minority voting rights. (*Thornburg v. Gingles* (1986) 478 U.S. 30, 48.) This common system can serve legitimate ends. But under certain circumstances it is possible to weaken a group's electoral success by using at-large voting instead of district voting.

A hypothetical example illustrates the point.

In this hypothetical we speak generally of groups, because the groups in electoral cases often are political parties rather than expressly racial or ethnic groups. This statute is drafted

28

specifically in terms of racial, color, and language groups, but the mechanisms of voting dilution extend beyond these categories.

For our hypothetical, assume everyone votes strictly according to group membership and, if possible, only for candidates who are members of their own group. Further assume one group has voting power of only 10 percent in a given city but, within that city, the group's voting power in neighborhood X is 60 percent. If neighborhood X were a voting district, the group could elect one of its own members as a district representative. The 60 percent neighborhood voting power would guarantee success. But now switch to at-large voting. This switch defeats the group's ability to elect anyone from its own ranks, because 10 percent is not enough to win. Changing from district to at-large voting under these circumstances would weaken that group's electoral success: the change would deny it the ability it previously had to elect a member of its own group.

This hypothetical example shows, with district voting, the group could elect one representative belonging to its group. But with at-large voting, the group could not elect anyone from its own group. Going from one representative to zero would dilute this group's ability to elect candidates from its group. Under these circumstances, an at-large system has diluted the group's voting power in a politically damaging way: the group lost the power to elect a representative of its choice.

The possibility of dilution does not mean it is generally a negative outcome when voters in a minority lose an election. Generally, democracy is majority rule. Under ideal conditions in a democracy, the majority of voters tends to win and the minority of voters tends to lose. When candidates or causes lose elections

simply because too few voters support them, that is not democracy failing.  That is democracy working.

The dilution element thus must do the work of distinguishing between the general case, when majority rule is proper, and the special case, when some mechanism has improperly diluted minority voting power.

D

The City correctly notes Pico offered no valid proof of dilution.

As we have observed, the dilution element required Pico to prove the City's at-large method impaired Latinos' ability to elect candidates of their choice or to influence the outcome of an election as a result of the dilution of Latino voting rights.  (§ 14027.)

One cannot speak of the dilution of the value of a vote until one first defines a standard as to what a vote should be worth. Justice Frankfurter made this point in his long and bitter dissent from the landmark decision in *Baker v. Carr* (1962) 369 U.S. 186, 300 (dis. opn. of Frankfurter, J.).  Frankfurter thought his point was a reason to reject that decision, but the case law in its wake accepted his wisdom and built it into a standard litigation practice.  (E.g., *Reno v. Bossier Parish School Bd.* (1997) 520 U.S. 471, 480 [plaintiffs must postulate an alternative voting practice to serve as the benchmark undiluted voting practice, because the concept of vote dilution necessitates the existence of an undiluted practice against which the fact of dilution may be measured].)

Pico agreed it was its burden to postulate a reasonable alternative voting practice to serve as the undiluted benchmark. Pico proposed a district system that, for one district within the City, would have 30 percent Latino voting power, as compared to

the 14 percent city-wide voting power Latinos hold in at-large elections.

Pico's showing was insufficient. Pico failed to prove the City's at-large system diluted the votes of Latinos. Assuming race-based voting, 30 percent is not enough to win a majority and to elect someone to the City Council, even in a district system. There was no dilution because the result with one voting system is the same as the result with the other: no representation.

Pico thus failed to show the at-large system was the reason Latinos allegedly have had trouble getting elected to the City Council. The reason for the asserted lack of electoral success in Santa Monica would appear to be that there are too few Latinos to muster a majority, no matter how the City might slice itself into districts or wards. At-large voting is not to blame. Small numbers are.

Perhaps the same holds true for other minorities in Santa Monica. Pico's briefing, however, gives us little data about other groups and their electoral histories in Santa Monica.

In passing, the trial court mentioned "cumulative voting, limited voting and ranked choice voting" as systems that, as alternatives to district voting, would also "enhance" Latino voting power. The court's treatment of these alternatives was perfunctory. The court did not define cumulative voting, limited voting, or ranked choice voting. Nor did it attempt to analyze how each might satisfy the dilution element. This fleeting reference, which Pico authored, is insubstantial and cannot support the judgment.

### E

Pico responds with two arguments.

1

First, Pico argued the Act contains no dilution element at all. In its 95-page brief, Pico devoted only one sentence to this argument. An amicus brief also argued this point. At oral argument, however, Pico expressly and conclusively abandoned this argument, and for good reason.

To grasp this argument, recall element four requires plaintiffs to prove racially polarized voting occurred in elections held by the political subdivision. (§§ 14028 [stating this element], 14026, subd. (e) [defining racially polarized voting].)

Pico claimed a showing of racially polarized voting under section 14028 completely satisfies and thus supplants the dilution element in section 14027. Pico quoted the first sentence of subdivision (a) of section 14028: "A violation of Section 14027 is established if it is shown that racially polarized voting occurs in elections for members of the governing body of the political subdivision or in elections incorporating other electoral choices by the voters of the political subdivision."

Pico thus contended the word "dilution" in section 14027 has no content independent of subdivision (a) of section 14028.

Pico's analysis contravened principles of statutory interpretation, in two independently fatal ways. Standard principles of statutory interpretation direct us to the ordinary meaning of the statutory words, the related provisions, and the structure of the statutory scheme. (*Scholes*, *supra*, 8 Cal.5th at p. 1103.)

Two standard factors—statutory text and the rule against surplusage—upend Pico's argument and have forced Pico to abandon it. We now detail the application in this case of these two aspects of statutory interpretation.

a

The statutory text is paramount and is contrary to Pico's argument. Three sections require plaintiffs to satisfy *both* the dilution element of section 14027 and section 14028's requirement of racially polarized voting. The three sections containing this decisive language are sections 14032, 14029, and 14030.

Section 14032 of the Act grants a private right of action to any voter in a protected class who resides in a political subdivision where a violation of sections 14027 *and* 14028 is alleged.

Section 14029 also is compelling, as plaintiffs gain remedies only by establishing a violation of both 14027 *and* 14028.

Section 14030 follows the same pattern for attorney fees and costs.

In sum, the legislature required litigants to prove both dilution *and* racially polarized voting to establish a claim, to have a remedy, and to recover fees.

These statutory passages require sections 14027 and 14028 to have independent content. Pico's argument ran aground on this requirement.

b

A second and independently fatal problem with Pico's argument was the rule against surplusage. If the Legislature had intended the result Pico urges, it would not have included the word "dilution" in the Act. But it did, and that too defeated Pico's argument.

Pico argued the statutory word "dilution" was mere surplusage. But surplusage in legislation is unusual and

33

disfavored.  The venerable assumption is drafters avoid surplusage and therefore so should judges who interpret the drafting.  (E.g., *People v. Leiva* (2013) 56 Cal.4th 498, 506 [avoid a construction that makes some words surplusage]; *Market Co. v. Hoffman* (1879) 101 U.S. 112, 115–116 [this rule was old in 1879].)

The word "dilution," moreover, is not just any old word.  The word "dilution" has been a core part of the voting rights vocabulary at least since the 1964 decision in *Reynolds v. Sims*, *supra*, 377 U.S. at pages 555 and footnote 29, 557, 563, 567, 568.  Dissenting Justice Harlan wrote the entire decision in that landmark voting rights case boiled down to the concept of dilution.  (See *id.* at p. 590 (dis. opn. of Harlan, J.).)

It would have been incongruous for the Legislature to make a key word nugatory.  Pico cited no precedent for this illogical form of statutory interpretation.

Pico's proposed interpretation of the Act thus was incorrect.  (Cf. *Sanchez*, supra, 145 Cal.App.4th at p. 666 [Act was designed to combat a kind of vote dilution].)

In sum, it is incorrect to read the Act to say a mere showing of racially polarized voting necessitates a finding a city has misapplied at-large voting.  Under the Act, racially polarized voting is a necessary but not sufficient element.  Dilution also is an independent and necessary element.  As we have explained, Pico did not prove dilution.

2

Pico's second response is its "influence" argument.  Pico argues the change from 14 percent to 30 percent is legally significant because it increases the electoral "influence" of

34

Latinos. The Legislature added the word "influence" to section 14027 of the Act but did not define it.

Pico proposes a definition of this word that would give a winning cause of action to any group, no matter how small, that can draw a district map that would improve its voting power by any amount, no matter how miniscule. The trial court followed this approach by asking whether "some alternative method of election would enhance Latino voting power." According to this standard, any unrealized increase in a group's percentage would satisfy the dilution element.

This standard is untenable because it would create absurd results.

A hypothetical illustrates this fatal problem.

Assume three facts: there are 3,000,000 voters in a city; 3,000 belong to a small racial group G; and all voters are racially polarized in the sense voters will vote only for candidates of their own race.

In an at-large election, group G would constitute 0.1 percent of the electorate. Suppose we now switch from at-large voting to voting in 15 districts, each with 200,000 voters, and we draw the lines to maximize the voting power of group G. Now one district incorporates all 3,000 voters of group G. Thus group G would increase its voting power from 0.1 percent strength at large to 1.5 percent in that district. A change from 0.1 to 1.5 percent is a 15-fold increase, which seems sizeable in relative terms. This change would improve G's "influence" as Pico would define the term. But a group with a vanishingly small numerical presence—be it .01 percent or 1.5 percent—can have no practical numerical influence in any voting system. There are simply too

35

few voters in group G to be numerically effective in an environment of race-based voting.

To define "influence" as Pico proposes would merely ensure plaintiffs always win.

Pico cites the case of *Georgia v. Ashcroft*, *supra*, 539 U.S. at pages 470–471, 482–483. *Georgia v. Ashcroft* is inapposite in many ways. It interpreted section 5 of the federal Voting Rights Act, not section 2. These sections combat different evils and, accordingly, impose different duties. (*Id.* at pp. 477–478.) Section 5 deals with "retrogression," *id.* at p. 477, which is not a subject of the California Voting Rights Act. And *Georgia v. Ashcroft* merely held a trial court failed to consider all relevant factors when examining whether a redistricting plan would diminish minority voters' effective exercise of the electoral franchise. (*Id.* at p. 485.) It did *not* hold groups will influence elections at the 30 percent level but not at the 14 percent level. The holding in *Georgia v. Ashcroft* does not assist Pico. (See *Bartlett v. Strickland* (2009) 556 U.S. 1, 19–20 (plur. opn. of Kennedy, J.) [a party asserting § 2 liability must show the minority population in the potential election district is greater than 50 percent].)

Pico seeks to rescue its influence argument by suggesting non-Latinos might "cross over" and vote for Latino candidates, buoying Latino power and clearing the 50 percent threshold to electoral success. This suggestion arbitrarily embraces racially polarized voting when it helps and abandons it when it hurts. It creates a manipulable standard boiling down to plaintiff always wins.

The City agrees some "influence" claims in theory could be valid if evidence showed a near-majority of minority voters in a

hypothetical district would often be sufficient for the minority group to elect its preferred candidates. But the City correctly notes we need not decide that question today, for this case presents no such district.

At oral argument, Pico said plaintiff Maria Loya would have won using the seven-district map the trial court adopted. The trial court, however, made no such finding. Nor did Pico's briefing to us argue this point, which Pico thereby forfeited. Parties cannot fairly raise a new theory for the first time in oral argument, for that tactic deprives the other side of notice and an opportunity to be heard. It likewise deprives the court of a thoughtful adversarial discussion of the issue. (E.g., *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 5, fn. 12, 19 [parties forfeit issues and arguments raised for the first time at oral argument].)

Dilution requires a showing, not of a merely marginal percentage increase in a proposed district, but evidence the change is likely to make a difference in what counts in a democracy: electoral results.

In sum, Pico failed to prove dilution. The City did not violate the statute. In light of this conclusion, we do not reach the issues of whether there was racially polarized voting or whether the trial court's interpretation of the Act would make the Act unconstitutional as applied to this case.

We turn to the constitutional question.

### III

The constitutional question concerns equal protection. The trial court found the City's voting system violated equal protection because, in 1946 and again in 1992, the City acted with the purpose of suppressing Latino political power. The court, however, applied an erroneous legal standard to reach

37

these faulty conclusions.  A proper analysis shows Pico did not prove the City adopted or maintained its system for the purpose of discriminating against minorities.

A

Federal and state equal protection standards are not always the same, but they are for this analysis.  (See *Jauregui, supra*, 226 Cal.App.4th at p. 800 [California decisions involving voting issues closely follow federal constitutional analyses].)  The trial court took this approach and no party disputes it.

The City correctly argues the trial court applied the wrong legal rule.  We independently review this question of law.  (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 932.)  This analysis does not require us to resolve disputed facts.

In this case there were no eyewitnesses who testified in a pertinent way to the crucial events.  Rather, direct evidence about the key events came from three types of historical artifacts: (1) 1946 newspaper excerpts, voting records, and the proposed charter; (2) the 1992 Charter Review Commission report, and (3) the July 7, 1992 City Council meeting video.  These historical artifacts are the core of record for the equal protection analysis. They were not created for purposes of litigation.

We independently review trial court findings based on historical artifacts like videotapes.  (See *Scott v. Harris* (2007) 550 U.S. 372, 379–380 (*Scott*) [appellate judges interpret "what we see on the video" for themselves; the appellate court gives no deference to the trial court's findings]; *id*. at p. 384 [as a matter of law, appellate judges conclude video shows car driver posed a threat to pedestrians; no deference]; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 ["Because the trial court's findings were based

38

solely upon documentary evidence, we independently review the record."].)

Historical artifacts differ from the live witness testimony in a case Pico cites: *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 924–928. We are in the same position as the trial court was to evaluate materials like the 1946 newspaper clippings, the 1992 commission report, and the 1992 video. We do not defer to a trial court's reaction to historical artifacts like these, any more than we would defer to a trial court's "findings" that A Room of One's Own concerns Napoleon in Russia or that Citizen Kane shows Druids built Stonehenge. News articles, videos, and other texts that were not created for litigation are different from witnesses in a courtroom testifying and being cross-examined under oath, and are not fit topics for trial court factfinding to which appellate courts will defer.

Deference to factual findings stems from the fact finder's observation of the demeanor of live witnesses and their manner of testifying. (*In re Avena* (1996) 12 Cal.4th 694, 710.) That deference is inappropriate when evidence does not involve the credibility of live testimony. (*In re Resendiz* (2001) 25 Cal.4th 230, 249; see also *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 79 [no deference is given to trial court's conclusion about written documents, because trial and appellate courts were in the same position in interpreting that evidence].)

Experts in this case testified about these written and video artifacts, but that does not change our analysis. Appellate courts are not required to defer to expert opinion regarding the ultimate issue in a case. (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 650.) "Expert" opinion about how a court should interpret, for instance, this 1992 video is simply highly

partisan advocacy in the guise of evidence; this type of "expert testimony" boils down to argument, not evidence.  Courts have been familiar with this problem for some time.  (Cf. *Winans v. N.Y. & Erie Railroad Co.* (1858) 62 U.S. (21 How.) 88, 101 [courts cannot receive professors to prove to the court the proper or legal construction of instruments of writing; experience shows that opposite opinions of persons professing to be experts may be obtained in any amount].)

B

The central purpose of equal protection is to prevent officials from discriminating on the basis of race.  (*Washington v. Davis* (1976) 426 U.S. 229, 239.)  An inquiry into the *purpose* of the challenged conduct is essential.  A showing of a racially disproportionate *impact* alone is insufficient.  (*Rogers v. Lodge* (1982) 458 U.S. 613, 617–618.)  To prevail on its equal protection violation claim, Pico had to prove the City adopted or maintained its at-large system with the purpose of discriminating against minorities.  (*Washington v. Davis*, *supra*, at pp. 239–244.)   The parties agree on this.

Discriminatory *purpose* requires more than *knowledge* of consequences.  (*Personnel Administrator of Mass. v. Feeney* (1979) 442 U.S. 256, 279 (*Feeney*).)  It implies the decision maker selected or reaffirmed a particular course of action not in spite of adverse impact on a group, but because of that impact.  (*Ibid.*)

The facts of *Feeney* illustrate the difference between the mental states of purpose and knowledge:  between acting with the goal of achieving an end, which is purpose, and merely acting with awareness a side effect will result, which is knowledge.

In *Feeney*, a Massachusetts statute gave veterans preference over others for state jobs.  The goal was not to harm

women, but that was the effect, because only two percent of veterans then were women. The statute created winners and losers, and, overwhelmingly, women lost. Legislators knew that would happen. They knew nearly all veterans at that time were men. But the law did not deny women equal protection, even though its authors knew it would disproportionately harm women, because harming women was not their purpose. (*Feeney*, *supra*, 442 U.S. at pp. 270, 274–281.)

This equal protection principle holds true as a general matter. (*Rogers v. Lodge*, *supra*, 458 U.S. at pp. 617–618.) Legislators' awareness of a racially disparate impact is not enough to prove their intent to discriminate by race. (*City of Mobile v. Bolden* (1980) 446 U.S. 55, 66–67, 71 & fn. 17, superseded by statute on other grounds.)

This careful distinction between purpose and knowledge is familiar in the law. The Model Penal Code precisely defined purpose and knowledge. (See Model Pen. Code, § 2.02, subd. (2)(a) & (b).) Its definitions perfectly fit the distinction *Feeney* drew.

People act *purposely* to achieve gender or race discrimination when it is their conscious object to engage in conduct of that nature or to cause such a result. People act *knowingly* when they are aware it is practically certain their conduct will cause a disparate impact along gender or racial lines. (See Model Pen. Code, § 2.02, subd. (2)(a) & (b).)

The logic of this constitutional distinction is apparent. Redistricting legislatures presumably are aware of racial demographics, just as we presume they are aware of age, economic status, and other demographic factors. But this awareness, this *knowledge*, does not prove a *purpose* of race

41

discrimination. (*Shaw v. Reno* (1993) 509 U.S. 630, 646.) Plaintiffs must show the government adopted or maintained the election system for the purpose of racial discrimination. A knowledge of a disparate impact is not enough. (*City of Mobile v. Bolden*, *supra*, 446 U.S. 55 at pp. 66–67, 71 & fn. 17.)

The trial court departed from these equal protection standards. Its departure invalidates its conclusions. The trial court erroneously concluded the City acted with discriminatory intent in 1946, when the City adopted its at-large system, and in 1992, when the City left this at-large system unchanged. But there was no evidence the City had the *purpose* of engaging in racial discrimination on either occasion. For this reason, the City's actions did not violate equal protection.

We examine events in 1946 and then 1992.

1

In 1946, 100 percent of the leaders of the minority community who expressed a public opinion supported the City's action. None opposed it. The people who knew best and cared most detected no City purpose of race discrimination against them. As a matter of law, this unanimous evidence is a litmus test dictating a finding in the City's favor. The City in 1946 did not act with a purpose of race discrimination.

Contemporaneous and unanimous support from minority community leaders shows the 1946 charter was not a hostile effort to oppress minorities. No one has a more sensitive eye or a stronger vested interest than leaders of minority communities. If they speak publicly with one supporting voice, as they did about the election in 1946, minority leaders are bellwethers for voters who care most keenly about the quality of life for minorities.

42

Pico's claim is unprecedented. It asks us to rule a city and its electorate engaged in hostile discrimination against minorities when that city and its electorate *did what minority leaders asked*. Pico cites no case with that illogical holding.

Pico does not explain how it, today, has greater insight into the racial realities of 1946 than the unified leaders of the minority communities who, in 1946, lived in Santa Monica. Pico does not argue all these leaders were somehow tricked, out of touch, muzzled, or corrupted. Pico simply suggests their views do not matter. This is error.

Pico incorrectly contends "both proponents and opponents of at-large elections understood such elections would prevent minority representation." To the contrary, the evidence shows there was uniform minority support for the City's 1946 charter change. The only newspaper critiques of the proposed charter were advertisements run by an anonymous group calling itself the Anti-Charter Committee.

The work of the anonymous Anti-Charter Committee does not show a general understanding the Charter would harm minority groups. It is not evidence minority communities were divided in their support of the 1946 charter.

In 1946, the identity of Anti-Charter Committee members became a notorious issue in the City. In its ads attacking the charter, the Anti-Charter Committee identified itself only as "a group of business men [sic] and other private citizens." A newspaper editorial, however, questioned who belonged to, and who contributed to, this "well-heeled group." This editorial contrasted the open and published "names of nearly 200 prominent Santa Monica citizens who have endorsed the new city charter" with the secrecy surrounding the identity of the Anti-

43

Charter Committee's membership and its source of funding. The editorial asked if the Anti-Charter Committee's contributors included people "who sell certain supplies to the city government under contracts very favorable to them, and who are unwilling to have their names appear?" "The people of Santa Monica are entitled to know who they are."

The Anti-Charter Committee never responded to this editorial, so far as the record shows.

The Anti-Charter Committee's ads provide insight into its perspective. One ad, titled "Who's Going to Manage the City Manager?", states that, "[l]ike Communism, the [charter's] theory of a city-manager-operated city is wonderful. Practically it does not work out. Dictatorship never does."

A different Anti-Charter Committee ad stressed systems like the one in the proposed charter "have higher tax rates and higher indebtedness" than the City's existing system. "Don't write a blank check and give it to a cause that has proved itself a spendthrift!"

Another Anti-Charter Committee ad stated "[t]he first claim of minority groups is that they are making a change in the interest of 'true democracy'—this is much the same manner as the communists work from within."

This same ad continued: "Do you want increased taxes, rule of the city by a few? If you don't, then—VOTE NO . . . ."

Another ad, titled "DO YOU WANT THIS DISASTER IN SANTA MONICA?", reprinted letters to the editor from a paper in Montebello, which the ad said had a government like the proposed Freeholders' charter. The letters expressed anger at the high taxes and expenditures in Montebello. After these letters, the ad concluded:

"What more could be said to prove our point that this proposed Charter will plunge Santa Monica into bitter political strife and chaos; it will mean unbearable taxation, will establish dictatorial rule that will starve out minority groups and will throw our entire model Civil Service into the discard."

Pico puts special emphasis on one Anti-Charter Committee ad titled "MINORITY GROUPS and the Proposed Charter." This ad posited "[t]he lot of a member of a minority, whether it be in a location of not-so-fine homes, or one of race, creed, or color, is never too happy under the best of conditions." The ad predicted the proposed charter would create a "dictatorship" of council members who would "mostly originate from North of Montana" and this "dictatorship type of government" would block access to government. "Where will the laboring man go? Where will the Jewish, colored, or Mexican go for aid in his special problems?"

No evidence shows any "laboring man" or the "Jewish, colored, or Mexican" supported the Anti-Charter Committee or its advertising or opposed the 1946 charter.

Pico's reliance on these ads is misplaced. The Anti-Charter Committee was not an advocate for minorities or for minority voting rights. Pico claims news clippings show everyone in Santa Monica in 1946 understood at-large voting disadvantaged minorities, but the news clippings show the opposite. Nor are they reason to discard the legal principle that unanimous minority support for an electoral result shows the election was not the product of racial prejudice against those minorities.

The same holds for Pico's other supposed sources of insight into the 1946 election. All these arguments unacceptably assume Pico and its experts can know better than minority leaders in 1946 what was good for minorities in 1946.

In sum, Pico failed to prove the City acted with the purpose of discriminating against racial minorities in 1946. (*Feeney*, *supra*, 442 U.S. at pp. 279–281.) To the contrary, minority leaders who spoke in 1946 unanimously favored the City's action. The City did not violate equal protection in 1946.

2

We turn to 1992.

In 1992, the City appointed a 15-member commission that wrote a high-minded and comprehensive, but perplexing, report. The report was perplexing because it expressed strong dissatisfaction with the status quo but offered no consensus alternative. The report's final recommendation was to delay action and gather more information. The City Council met publicly to mull the report. This public discussion was a model of civic engagement: substantive, open, participatory, and cordial. There was never a hint of hostility to minorities. To the contrary, speaker after speaker sought ways of increasing minority empowerment. But after discussing the issue for hours the City Council remained deadlocked about the right alternative to the status quo and resolved simply to study the issue further.

As a matter of law, this series of actions was not purposive race discrimination. The trial court erred again by applying the wrong legal standard. *Feeney* required proof of a *purpose* of racial discrimination. There was none.

"There is, [moreover], an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by

46

[Pico].” (*Scott*, *supra*, 550 U.S. at p. 378.) Pico's version of events is "so utterly discredited" by this video as to dictate judgment for the City. (*Id*. at p. 380.) The trial court "should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." (*Id*. at pp. 380–381.)

We have studied this 1992 videotape. It contains nothing showing a purpose of racial discrimination.

Pico incorrectly focuses on a single sentence from one speaker, and argues this sentence showed the City's entire deliberation and vote was for the purpose of hostile race discrimination. This one sentence was when Councilmember Zane said "And so, you gain the representation but you lose the housing."

This sentence is not evidence the City had a purpose of hostile discrimination against anyone. This sentence contained no express, implied, or coded racial reference or hostile purpose of racial discrimination.

An objective observer watching this video sees Zane ask about an incentive that district voting creates. This incentive is for district representatives to be more responsive to district voices. Zane questions whether this is a good thing. He was concerned this incentive would imperil a political cause he favored: affordable housing projects.

Zane supported affordable housing. Affordable housing is not a policy with a purpose of harming Latinos or minorities. For instance, Councilmember Antonio Vazquez testified Santa Monicans for Renters' Rights endorsed his successful run for the Santa Monica City Council in 1990, and he thought he probably would not have won without that endorsement.

47

Zane noted affordable housing projects usually engendered NIMBY protests from neighbors. Zane asked Richard Farjado and Charter Review Commissioner Doug Willis whether they would acknowledge a drawback of district voting in this context. The drawback, Zane explained, was the proclivity of district representatives to oppose affordable housing projects because of their heightened sensitivity to neighborhood protests. "A small district makes those protesters look very powerful," said Zane.

Zane made no reference to Latinos or the Pico area. He suggested he was concerned with a general tendency, not a particular district: "I'm not trying to identify a particular district."

Zane expressed concern district voting would make NIMBY voting so prevalent as to doom affordable housing projects. Richard Fajardo, a former MALDEF lawyer with experience in voting rights cases, agreed "that has been an issue and that has been a problem" because "even within the Latino community" a debate between homeowners and renters would have to continue.

In context and beyond question, Zane's comment was not a statement of discrimination against Latinos. The entire exchange, in context, was a substantive and cogent discussion of the pluses and minuses of district voting. There were no coded messages of hostility to Latinos or revealing Freudian slips.

Pico claims Zane implied the Pico area was a dumping ground for undesirable low-income housing projects. This claim is incorrect. Zane explained he was not discussing particular districts but rather the tendency of any district representative to fear the local protest Zane said typically accompanied affordable housing projects.

We decline Pico's invitation to take the unprecedented and unwise path it urges.

When a city's commission supports minority empowerment but neither it nor the city can achieve consensus about the right alternative to at-large voting, the municipal decision to gather more information does not violate equal protection. As a matter of law, a court need go no further to vindicate this decision against the allegation of an invidious purpose.

In sum, the City did not act with a racially discriminatory purpose in 1946 or in 1992. Pico's equal protection claims fail.

We gave the parties our tentative opinion in this case in advance of oral argument. This tentative opinion included the equal protection analysis presented here, including our statement of the standard of review and our analysis of the 1946 news clippings and the events of 1992. At oral argument, Pico forcefully and at considerable length presented its response to our tentative opinion, but did not contest our equal protection analysis in any respect.

The City did not violate the California Voting Rights Act or the California Constitution. We do not reach the remedies issue because there was no wrong to remedy.

## DISPOSITION

We reverse the judgment.  We award costs to, and direct the trial court to enter judgment for, the City of Santa Monica.


WILEY, J.

We concur:


BIGELOW, P. J.


GRIMES, J.

50